**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 17-2406**

———————————

SIERRA CLUB; APPALACHIAN VOICES; CHESAPEAKE CLIMATE ACTION NETWORK; WILD VIRGINIA,

      Petitioners,

v.

STATE WATER CONTROL BOARD; ROBERT DUNN, Chair of the State Water Control Board; HEATHER WOOD, Vice-Chair of the State Water Control Board; LOU ANN JESSE-WALLACE, Member of the State Water Control Board; TIMOTHY G. HAYES, Member of the State Water Control Board; ROBERTA A. KELLAM, Member of the State Water Control Board; G. NISSA DEAN, Member of the State Water Control Board; ROBERT WAYLAND, III, Member of the State Water Control Board; DEPARTMENT OF ENVIRONMENTAL QUALITY; DAVID K. PAYLOR, Director, Department of Environmental Quality; MELANIE D. DAVENPORT, Director, Water Permitting Division, Department of Environmental Quality,

      Respondents,

MOUNTAIN VALLEY PIPELINE, LLC,

      Intervenor.

———————————

CHESAPEAKE BAY FOUNDATION, INC.,

      Amicus Supporting Petitioner.

———————————

**No. 17-2433**

———————————

DEL. SAM RASOUL; PRESERVE CRAIG, INC.; DOE CREEK FARM, INC.; GEORGIA HAVERTY; FOUR CORNERS FARM, LLC; DAVID J. WERNER; BETTY B. WERNER; IAN ELLIOTT REILLY; CAROLYN ELIZABETH REILLY; ROBERT M. JONES; DONNA T. JONES; BLUE RIDGE ENVIRONMENTAL DEFENSE LEAGUE; PRESERVE BENT MOUNTAIN; PRESERVE FLOYD; PRESERVE FRANKLIN; PITTSYLVANIA PRIDE,

   Petitioners,

v.

STATE WATER CONTROL BOARD; ROBERT DUNN, Chair of the State Water Control Board; HEATHER WOOD, Vice-Chair of the State Water Control Board; LOU ANN JESSE-WALLACE, Member of the State Water Control Board; TIMOTHY GEORGE HAYES, Member of the State Water Control Board; ROBERTA A. KELLAM, Member of the State Water Control Board; G. NISSA DEAN, Member of the State Water Control Board; ROBERT WAYLAND, III, Member of the State Water Control Board; DEPARTMENT OF ENVIRONMENTAL QUALITY; DAVID K. PAYLOR, Director, Department of Environmental Quality; MELANIE D. DAVENPORT, Director, Water Permitting Division, Department of Environmental Quality,

   Respondents,


MOUNTAIN VALLEY PIPELINE, LLC,

   Intervenor.

_____

CHESAPEAKE BAY FOUNDATION, INCORPORATED,

   Amicus Supporting Petitioner.

_____

On Petition for Review of a Decision of the Virginia Department of Environmental Quality. (FERC Docket No. CP16-10-000)

_____

Argued: May 8, 2018       Decided: August 1, 2018

Before GREGORY, Chief Judge, TRAXLER, and THACKER, Circuit Judges.

Petition for review denied by published opinion. Judge Traxler wrote the opinion, in which Chief Judge Gregory and Judge Thacker joined.

**ARGUED:** Benjamin Alan Luckett, APPALACHIAN MOUNTAIN ADVOCATES, INC., Lewisburg, West Virginia, for Petitioners. Toby Jay Heytens, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Respondents. George Peter Sibley, III, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Intervenor. **ON BRIEF:** Joseph M. Lovett, Derek O. Teaney, APPALACHIAN MOUNTAIN ADVOCATES, INC., Lewisburg, West Virginia, for Petitioner Sierra Club, et al. Tammy L. Belinsky, Copper Hill, Virginia, for Petitioner Del. Sam Rasoul, et al. Mark R. Herring, Attorney General, J. Duncan Pitchford, Assistant Attorney General, David C. Grandis, Assistant Attorney General, Matthew R. McGuire, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Respondents. Kevin S. Elliker, Richmond, Virginia, Deidre G. Duncan, HUNTON ANDREWS KURTH LLP, Washington, D.C.; Christopher D. Pomeroy, Justin Curtis, AQUALAW PLC, Richmond, Virginia, for Intervenor. Jon Mueller, CHESAPEAKE BAY FOUNDATION, INC., Annapolis, Maryland, for Amicus Curiae.

TRAXLER, Circuit Judge:

Virginia certified under Section 401 of the Clean Water Act that it had reasonable assurance that certain activities regarding the construction of a natural gas pipeline would not degrade the state's water. Several environmental groups, individuals, and other entities petition for review. Concluding that Virginia's issuance of the certification was not arbitrary and capricious, we deny the petition for review.

I.

A.    The Project

The Mountain Valley Pipeline Project (the "Project") is a proposed interstate natural gas transmission pipeline that will be approximately 303 miles long and 42 inches in diameter and will transport natural gas from Wetzel County, West Virginia, to Pittsylvania County, Virginia. Much of the Project crosses topography with steep slopes and areas that are susceptible to landslides. Approximately 106 miles of the pipeline will be located in Virginia, and constructing the pipeline requires 385 stream crossings and 144 wetland crossings in the Commonwealth.

Mountain Valley Pipeline, LLC ("MVP") proposes to construct and operate the pipeline in Virginia and West Virginia.[1] MVP generally would use a 125-foot-wide construction right-of-way in uplands and a 75-foot-wide right-of-way through wetlands. MVP would retain a 50-foot right-of-way permanently to operate the pipeline. For

---

[1]    Equitrans, L.P. also applied to construct and operate a portion of the pipeline that would provide service from western Pennsylvania and interconnect with the Project in Wetzel County, West Virginia. That portion of the pipeline is not a subject of the petition for review before us.

overland construction, MVP would generally need to clear the land of trees and vegetation, then dig a trench of up to nine feet in depth, fracturing and blasting rock where necessary. Waterbody crossings would be dry open-cut crossings; MVP would temporarily divert the water from the construction area and bury the pipeline two to four feet below the streambed.

B.      Federal Statutes and Agencies

The Natural Gas Act ("NGA") requires that a party seeking to build or operate a natural gas pipeline must obtain authorization from the Federal Energy Regulatory Commission ("FERC") in the form of a "certificate of public convenience and necessity." The NGA and its implementing regulations set out the process for obtaining such a certificate. *See* 15 U.S.C. § 717 *et seq.*; 18 C.F.R. § 157.1 *et seq.*; *see generally East Tenn. Nat. Gas. Co. v. Sage*, 361 F.3d 808, 818 (4th Cir. 2004).

When FERC receives an application for a certificate of public convenience and necessity, it undertakes review of the environmental impacts of the proposed project under the NGA and under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, usually by accepting input from the public and producing an environmental impact statement ("EIS"). FERC serves as the "lead agency," coordinating the needed governmental authorizations, *see* 15 U.S.C. § 717n(b), including the one central to this case, Virginia's state water-quality certification under the Clean Water Act ("CWA").

NEPA sets out the procedures FERC must employ in considering the environmental impacts of agency actions. *See Robertson v. Methow Valley Citizens*

5

*Council*, 490 U.S. 332, 350 (1989). Council on Environmental Quality regulations require FERC to draft an EIS in stages, first preparing a draft and inviting public comment thereon, then considering the comments and responding to them, possibly by modifying its analysis. *See* 40 C.F.R. §§ 1503.1(a), 1503.4(a). In this way, the draft and the receipt of comments serve as a "springboard for public comment." *National Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1328 (D.C. Cir. 2004) (internal quotation marks omitted).

Because construction of the Project would involve discharge of dredged and fill materials into wetlands and waterways, MVP needed not only a certificate of public convenience and necessity from FERC, but also approval from the U.S. Army Corps of Engineers (the "Corps") under Section 404 of the CWA. *See* 33 U.S.C. § 1344(a); *AES Sparrows Point LNG, LLC v. Wilson*, 589 F.3d 721, 724 (4th Cir. 2009). Section 404 approval from the Corps may come in the form of an issuance of individual permits or the Corps' verification of the coverage "within the scope of an existing general permit, which acts as a standing authorization for developers to undertake an entire category of activities deemed to create only minimal environmental impact." *Crutchfield v. County of Hanover, Va.*, 325 F.3d 211, 214 (4th Cir. 2003) (citing 33 U.S.C. § 1344(e); 33 C.F.R. §§ 320.1, 330.1(b)-(c)).[2]

---

[2] "Activities falling within the scope of [a nationwide permit] are automatically authorized without any individualized inquiry, although preconstruction notification of the Corps is required in some cases." *Crutchfield v. County of Hanover, Va.*, 325 F.3d 211, 214 (4th Cir. 2003) (citing 33 C.F.R. § 330.1(e)). "In cases where preconstruction notification is required, the Corps will verify the applicability of the (Continued)

6

The NGA largely preempts environmental regulation of interstate natural gas pipelines by states. *See AES Sparrows Point LNG, LLC v. Smith*, 527 F.3d 120, 125-26 (4th Cir. 2008). However, it does "allow[] states to participate in environmental regulation of [pipelines] under three federal statutes: the Clean Air Act, the Coastal Zone Management Act, and the Clean Water Act." *Delaware Riverkeeper Network v. Secretary Pa. Dep't of Envtl. Prot.*, 833 F.3d 360, 368 (3d Cir. 2016) (citing 15 U.S.C. § 717b(d)).

The state action challenged in the petition before us was taken pursuant to Section 401 of the Clean Water Act. The relevant language provides that "[a]ny applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters" must seek "a certification from the State in which the discharge originates . . . that any such discharge will comply with the applicable provisions" of the CWA. 33 U.S.C. § 1341(a)(1). It provides that "[n]o license or permit shall be granted if certification has been *denied* by the State," but, if a state "*fails or refuses to act* on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived." *Id.* (emphasis added). Under the CWA's implementing regulations, the State also has the option of granting the certification based on certain conditions. *See* 33 U.S.C. § 1341(d); 40 C.F.R. § 121.2(a)(4); *PUD No. 1 of Jefferson*

[nationwide permit] to the proposed activity." *Id.* at 214-15 (citing 33 C.F.R. § 330.1(e)(2)).

*Cty. v. Washington Dep't of Ecology*, 511 U.S. 700, 712 (1994). Accordingly, a state receiving a Section 401 application has four options in total: it may grant a certificate without imposing any additional conditions; grant it with additional conditions; deny it; or waive its right to participate in the process. *See Delaware Riverkeeper Network*, 833 F.3d at 376 (noting states' options to deny certificate or to waive right to participate); *see also S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 380 (2006) ("Section 401 . . . was meant to continue the authority of the State to act to deny a permit and thereby prevent a Federal license or permit from issuing to a discharge source within such State." (alterations and internal quotation marks omitted)). If the state grants the certificate – whether with or without conditions – the certification must contain "[a] statement that there is *a reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards*." 40 C.F.R. § 121.2(a)(3) (emphasis added); *see PUD No. 1 of Jefferson Cty.*, 511 U.S. at 712.

As for appellate review of such a state certificate, § 717r of the NGA provides:

> The United States Court of Appeals for the circuit in which a facility subject to . . . [15 U.S.C. § 717f] is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a . . . State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval . . . required under Federal law.

15 U.S.C. § 717r(d)(1). It is undisputed here that the Project is subject to 15 U.S.C. § 717f.

C. Virginia Agencies and Virginia Law Regarding Issuance of Section 401 Certificates

Under Virginia law, the State Water Control Board (the "Board") possesses broad authority concerning permitting and regulatory matters that affect water quality in Virginia, including authority over Section 401 certifications. *See* Va. Code § 62.1-44.15. During the events in question, Virginia law provided that, "[i]ssuance of a Virginia Water Protection Permit shall constitute the certification required under § 401 of the Clean Water Act." Va. Code § 62.1-44.15:20(D).[3] Pursuant to the Virginia Water Protection Program (the "VWP Program"), the Board, after consulting with appropriate agencies and accepting and considering public comment, may issue a VWP permit "if it has determined that the proposed activity is consistent with the provisions of the Clean Water Act and the State Water Control Law and will protect instream beneficial uses." Va. Code § 62.1-44.15:20(B). And the Board may certify a nationwide Corps permit as

---

[3] On March 30, 2018, the Virginia legislature amended the statute, adding the emphasized language:

Issuance of a Virginia Water Protection Permit shall constitute the certification required under § 401 of the Clean Water Act, *except for any applicant to the Federal Energy Regulatory Commission for a certificate of public convenience and necessity pursuant to § 7c of the federal Natural Gas Act (15 U.S.C. § 717f(c)) to construct any natural gas transmission pipeline greater than 36 inches inside diameter, in which case issuance of a Virginia Water Protection Permit pursuant to this article and a certification issued pursuant to Article 2.6 (§ 62.1–44.15:80 et seq.) shall together constitute the certification required under § 401 of the federal Clean Water Act*.

Natural Gas—Pipes and Pipelines—Construction, 2018 Virginia Laws Ch. 636 (S.B. 950).

9

meeting these requirements so long as the permit meets specified criteria.[4]  *See* 9 Va. Admin. Code 25-210-130(H).

The Virginia Department of Environmental Quality ("DEQ") serves as the Board's staff, and the Board may assign DEQ tasks and delegate DEQ the authority to make decisions.  *See* Va. Code § 62.1-44.14.  We will refer to the Board and DEQ together as "the State Agencies."

D.     2017 Guidance Document

Until recently, it was only through the above-described process that DEQ issued its water-quality certificates for linear utility projects, including pipeline projects. However, in May 2017, as a result of comments from interested parties concerning the

---

[4]     Those criteria are met when the nationwide certificate and certification conditions:

> 1.     Require that wetland or stream impacts be avoided and minimized to the maximum extent practicable;
>
> 2.     Prohibit impacts that cause or contribute to a significant impairment of state waters or fish and wildlife resources;
>
> 3.     Require compensatory mitigation sufficient to achieve no net loss of existing wetland acreage and functions or stream functions and water quality benefits; and
>
> 4.     Require that compensatory mitigation for unavoidable wetland impacts be provided in accordance with 9 [Va. Admin. Code] § 25-210-116.
>
> 5.     Require that compensatory mitigation for unavoidable stream impacts be provided in accordance with 9 [Va. Admin. Code] § 25-210-116, including but not limited to an analysis of stream impacts utilizing a stream impact assessment methodology approved by the board.

9  Va. Admin. Code § 25-210-130(H).

10

Project, DEQ came to the conclusion that there was an analytical gap in the Rule 401 certification process. Namely, while VWP Permit coverage addresses the impacts caused to wetlands and streams by activities conducted in wetlands and streams, *see Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 194 (4th Cir. 2009), it does not account for activities occurring in upland areas that could also result in discharges into state waters or otherwise affect Virginia's water quality. *See* J.A. 100 ("The permits issued by the VWP program and the permits issued by the Corps only address the impacts caused to wetlands and streams by excavating in a wetland, draining or significantly altering wetland acreage or function, filling or dumping in a stream or wetland, or permanently flooding or impounding a wetland area or stream. However, the conditions and requirements of these permits do not cover activities in upland areas, outside of wetlands and streams, which may result in a discharge to state waters or otherwise cause or contribute to an exceedance of Virginia's Water Quality Standards.").

In recognition of this gap, DEQ recently issued its "2017 Guidance Document," establishing a process by which, as part of the 401 certification process, DEQ can review these potential effects from upland activities involved in a natural gas infrastructure project. *See* Va. Dep't of Envtl. Quality, Guidance Memo No. GM17-2003, Interstate Natural Gas Infrastructure Projects – Procedures for Evaluating and Developing Additional Conditions for Section 401 Water Quality Certification Pursuant to 33 USC § 1341 (May 19, 2017). It provides that DEQ may decide to seek additional information from pipeline applicants concerning upland activity that "may have the potential to affect water quality." *Id.* at 3. And it states that DEQ may recommend to the Board the

11

imposition of conditions on upland activities that are in addition to the conditions already imposed by or through the VWP Permit Program, the Corps, or FERC. *See id.*

E.    Virginia's Water Quality Standards and Water-Protection Laws

"Under the CWA, states have the primary role in promulgating water quality standards." *Piney Run Preservation Ass'n v. County Comm'rs of Carroll Cty.*, 268 F.3d 255, 265 n.9 (4th Cir. 2001). To do so, a state begins by identifying the uses for which the water will be protected; then, the state determines the level of water quality needed to protect the water for those uses. *See NRDC v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993). Two aspects of Virginia's water-quality policy are relevant here: its general narrative water-quality criterion and its antidegradation policy.

Virginia's water-quality criterion requires that "State waters . . . shall be free from substances attributable to . . . waste in concentrations, amounts, or combinations which contravene established standards or interfere directly or indirectly with designated uses of such water or which are inimical or harmful to human, animal, plant, or aquatic life." 9 Va. Admin. Code § 25-260-20(A). The criteria specify that any substance "that produce[s] . . . turbidity" is a substance to be controlled. *Id.* "Turbidity" refers to a measure of suspended solids in a water body, such as sediment.

By its terms, Virginia's antidegradation policy "shall be applied whenever any activity is proposed that has the potential to affect existing surface water quality."[5] 9 Va.

---

[5]    As the Supreme Court explained in *PUD No. 1 of Jefferson County*:

(Continued)

12

Admin. Code § 25-260-30(A). The policy divides the state's waters into three tiers and provides different levels of protection for each tier. *See* 9 Va. Admin. Code § 25-260-30(A). Tier 3 encompasses waters designated as "exceptional"; these waters "shall be maintained and protected to prevent permanent or long-term degradation or impairment." 9 Va. Admin. Code § 25-260-30(A)(3)(b)(1). The policy specifically provides that "[n]o new, additional, or increased discharge of sewage, industrial wastes or other pollution into [Tier 3 waters] shall be allowed." 9 Va. Admin. Code § 25-260-30(A)(3)(b)(2). However, "[a]ctivities causing temporary sources of pollution may be allowed in [Tier 3 waters] even if degradation may be expected to temporarily occur provided that after a minimal period of time the waters are returned or restored to conditions equal to or better than those existing just prior to the temporary source of pollution." 9 Va. Admin. Code § 25-260-30(A)(3)(b)(3).

Tier 2 encompasses waters that "exceed water quality standards." 9 Va. Admin. Code § 25-260-30(A)(2). The quality of such waters "shall be maintained and protected

---

When the Clean Water Act was enacted in 1972, the water quality standards of all 50 States had antidegradation provisions. These provisions were required by federal law. By providing in 1972 that existing state water quality standards would remain in force until revised, the Clean Water Act ensured that the States would continue their antidegradation programs. EPA has consistently required that revised state standards incorporate an antidegradation policy. And, in 1987, Congress explicitly recognized the existence of an "antidegradation policy established under [§ 303]." § 1313(d)(4)(B).

*PUD No. 1 of Jefferson Cty. v. Washington Dep't of Ecology*, 511 U.S. 700, 718 (1994) (citations omitted).

unless the board finds . . . that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located."  9 Va. Admin. Code § 25-260-30(A)(2).

Finally, Tier 1 encompasses all waters that do not qualify as Tier 3 or Tier 2.  For those waters, "existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected."  9 Va. Admin. Code § 25-260-30(A)(1).

Virginia generally protects its water from impacts from upland construction-related activities through the National Pollutant Discharge Elimination System ("NPDES") permits issued by Virginia under CWA section 402.  *See* 33 U.S.C. § 1342.  In particular, it utilizes its Virginia Pollutant Discharge Elimination System ("VPDES") Program and, more specifically, its General VPDES Permit for Discharges of Stormwater from Construction Activities (the "Construction General Permit").  9 Va. Admin. Code § 25-880-70 Part II.  That permit, in turn, incorporates the requirements of two other state laws, the Virginia Stormwater Management ("VSM") Law, Va. Code § 62.1-44.15:24 *et seq.*, and the Virginia Erosion and Sediment Control ("VESC") Law, Va. Code § 62.1-44.15:51, *et seq.*, which we will discuss in more detail ahead.

Virginia's regulatory scheme is a little different when the construction project in question is a natural gas pipeline.  That is because the CWA exempts natural gas pipeline construction projects from regulation.  *See* 33 U.S.C. § 1342(*l*)(2).  Still, Virginia is able to impose the same substantive requirements on natural gas pipeline projects through its Annual Standards and Specifications ("AS&S") Program.  *See* Va. Code § 62.1-

14

44.15:55(D). That program requires the project developer to submit annual standards and specifications for DEQ's review and approval, thereby ensuring that projects will meet the same requirements that would apply were they covered by the Virginia Construction General Permit. *See* 9 Va. Admin. Code § 25-870-170(A). However, once DEQ has approved a developer's annual standards and specifications as satisfying the requirements of the VSM and VESC, the entity generally need not submit site-specific VSM and VESC plans to DEQ for approval. *See* Va. Code § 62.1-44.15:55(D). In this way, projects become more self-regulating.

II.

MVP filed its application for a certificate of public convenience and necessity with FERC on October 23, 2015.

A.    FERC

As the NGA required, *see* 15 U.S.C. § 717n(b), FERC acted as the lead agency in preparing an EIS for the Project. FERC first issued a draft EIS in September 2016. Then during the 90-day period that followed, FERC conducted seven public meetings and received 1,237 written comments (many of which were from DEQ). Some of DEQ's suggestions included adjusting the Project route, requiring a revised Karst Mitigation Plan, creating an Acid Soil Mitigation Plan, revising the Blasting Plan, and adopting various measures to reduce erosion and the introduction of sediment into the water. FERC's final EIS, issued in June 2017, incorporated many of the suggestions DEQ had offered.

The EIS recognized that many aspects of the Project created the potential to negatively impact affected waters. With regard to upland construction activities, the EIS observed:

> The clearing and grading of stream banks could expose soil to erosional forces and would reduce riparian vegetation along the cleared section of the waterbody. The use of heavy equipment for construction could cause compaction of near-surface soils, an effect that could result in increased runoff into surface waters in the immediate vicinity of the proposed construction right-of-way. Increased surface runoff could transport sediment into surface waters, resulting in increased turbidity levels and increased sedimentation rates in the receiving waterbody. Disturbances to stream channels and stream banks could also increase the likelihood of scour after construction.

J.A. 771. The EIS stated that "[i]n order to limit impacts on riparian zones, the Applicants would follow measures outlined in its Procedures."[6] J.A. 771.

The EIS also recognized that flooding during construction was a potential concern. The EIS stated:

> To minimize or prevent impacts resulting from flash flooding during construction, the Applicants would remove any equipment or loose material from the affected area prior to any anticipated significant rain event. Additionally, the Applicants would implement erosion and sedimentation

---

[6] The EIS explained:

These measures allow a riparian strip at least 25 feet wide to permanently revegetate with native plant species across the entire construction right-of-way. A corridor centered on the pipeline and up to 10 feet wide may be cleared at a frequency necessary to maintain the 10-foot corridor in an herbaceous state; and trees that are located within 15 feet of the pipeline may be cut and removed from the permanent right-of-way. In addition, the riparian areas that are between HDD entry and exit point are not cleared during construction or mowed during operations.

J.A. 771.

16

control measures, such as installing trench breakers and water bars to inhibit water flow along the trench and right-of-way. Upon completion of construction, the Applicants would restore the ground surface as closely as practicable to original contours and re-establish vegetation to facilitate restoration of pre-construction overland flow.

J.A. 772. In the end, however, regarding construction of the Project that implementation of the various recommendations FERC had made and the plans MVP had agreed to follow, the EIS concluded:

> No long-term or significant impacts on surface waters are anticipated as a result of the projects, because Mountain Valley and Equitrans would not permanently affect the designated water uses, they would bury the pipeline beneath the bed of all waterbodies, implement erosion and sedimentation controls, adhere to crossing guidelines in their Procedures, and restore the streambanks and streambed contours as close as practical to pre-construction conditions. Temporary impacts would be avoided or minimized through the implementation of our recommendations . . . and various plans.

J.A. 775.

In October 2017, FERC issued a certificate of public convenience and necessity for the construction of the Project. The certificate includes 37 "Environmental Conditions," many of which reflect DEQ's input.[7] FERC noted that MVP "committed to use specialized construction techniques on steep slopes, including cut-and-fill and two-tone grading, to minimize adverse effects." J.A. 558. FERC also noted that MVP had developed a *Landslide Mitigation Plan* and FERC required that MVP revise the plan "to outline construction measures to be used when crossing steep slopes at angles

---

[7] FERC's issuance of the certificate is the subject of a petition for review pending in the Court of Appeals for the D.C. Circuit. FERC's issuance of the certificate is not a subject of the petition before us.

17

perpendicular to contours and to include a more robust monitoring program." J.A. 558. As for the concern that "slope failures will cause instream sedimentation," FERC also noted that MVP had "agreed to follow the measures outlined in [FERC's] *Upland Erosion Control, Revegetation, and Maintenance Plan . . .* and its *Wetland and Waterbody Construction and Mitigation Procedures*, which include erosion controls to prevent sedimentation into waterbodies." J.A. 558. FERC acknowledged that "these plans cannot fully prevent sedimentation, but would provide adequate protections by reducing sedimentation into streams and reducing the potential for slope failures." J.A. 558.

Also, "[t]o minimize potential impacts on karst related groundwater through construction associated sedimentation and runoff, [MVP] will implement the erosion control measures outlined in [FERC's] Plan and its *Karst-specific Erosion and Sediment Control Plan*." J.A. 566. Additionally, "to minimize the potential for hazardous materials leaking from construction equipment to contaminate groundwater, [MVP] will implement the measures outlined in its *Stormwater Pollution Prevention Plan* (SWPP Plan); *Spill, Prevention, Control, and Countermeasures Plan* (SPCC Plan); and *Unanticipated Discovery of Contamination Plan for Construction Activities in West Virginia and Virginia*." J.A. 566.

FERC's certificate noted that, with regard to streams crossed by the Project, FERC was taking into consideration not only the sedimentation that would be produced from the crossing itself, but also the sedimentation that would result from runoff from construction workplaces. FERC noted that the stream crossings would "result in temporary (less than

18

4 days) and localized (for a distance of only a few hundred feet of the crossing) increases in turbidity downstream of construction, but the magnitude of this increase is minimal compared to increased turbidity associated with natural runoff events." J.A. 569. FERC added that "[o]nce construction is complete, [MVP] will stabilize and restore streambeds and banks consistent with the *Wetland and Waterbody Construction and Mitigation Procedures*." J.A. 569.

In addition to all the measures FERC specifically required, FERC noted that the Corps and various state agencies "have the opportunity to impose conditions to protect water quality pursuant to sections 401 and 404 of the Clean Water Act." J.A. 570. FERC emphasized that "[t]he applicants must obtain all necessary federal and state permits and authorizations, including the water quality certifications, prior to receiving [FERC] authorization to commence construction." J.A. 570. FERC specifically concluded:

> Based on [FERC] staff's experience with pipeline construction, and [MVP's] commitment to cross waterbodies via dry-ditch methods, adherence to the measures in [FERC's] Plan and Procedures, [MVP's] proposal to conduct a stream monitoring plan, and use of [FERC's] third-party compliance program, we determine that impacts on waterbodies due to sedimentation will be effectively minimized.

J.A. 567.

FERC's certificate provided that MVP "must receive written authorization from the Director of OEP [Office of Energy Projects] before commencing construction of any project facilities." J.A. 628 (emphasis omitted). Finally, as is relevant here, the face of the certificate explained FERC's flexibility to deal with unforeseen contingencies with the potential to affect the environment:

19

The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the order, and take whatever steps are necessary to ensure the protection of all environmental resources during construction and operation of the project and activities associated with abandonment. The authority shall allow:

a.      the modification of conditions of the order;

b.      stop work authority; and

c.      the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation and abandonment.

J.A. 624-25 (Appendix C to the Certificate).

B.      Corps' Section 404 Review and Virginia's Related Section 401 Review

MVP requested its Section 404 permit from the Corps by filing a "Joint Permit Application" in February 2016. *See* 33 U.S.C. § 1344(a). The application served as a preconstruction notification under "Nationwide Permit 12" ("NWP 12"), which concerns "activities required for the construction, maintenance, repair, and removal of utilities lines and associated facilities in waters of the United States." J.A. 100. *See* 33 U.S.C. 1344(e)(1) (allowing the Secretary of the Army to issue permits on a "nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment"). Applicants seeking coverage under that permit must provide information that the Corps can use "to determine that the adverse environmental effects of the activity will be no more than

minimal and to determine the need for compensatory mitigation or other mitigation measures." J.A. 430. A project can be covered by NWP 12 only if it satisfies numerous conditions that apply generally to each nationwide permit. One such condition requires that construction include appropriate soil erosion and sediment controls. In this way, NWP 12 "ties in the requirements and practices of the VESC program and regulations." J.A. 112. Additionally, although NWP 12 authorizes disturbance of streams temporarily during construction, the permit requires that streams be restored to pre-construction condition once construction is complete.

In 2017, the Corps revised the requirements for NWP 12, *see* Issuance and Reissuance of Nationwide Permits, 82 Fed. Reg. 1860-01, 1985-86 (Jan. 6, 2017), which prompted MVP to revise its earlier-filed application. In MVP's revised application, MVP discussed in detail the Project's potential impacts on wetland, stream, and river crossings and the steps MVP would take to address them. In March 2017, the Corps added several Regional conditions specific to Virginia for the NWP 12.

As per Virginia law, the State Agencies then considered whether NWP 12 and the certification conditions satisfied the criteria necessary for Section 401 certification. 9 Va. Admin. Code 25-210-130(H). Following its consideration of public comment, the Board issued its certification on April 7, 2017, concluding that the requisite criteria had been satisfied (the "April 401 Certificate"). The certification stated that "the Board finds that there is a reasonable assurance that the activities permitted under the Corps' NWP program . . . will be conducted in a manner which will not violate applicable water

21

quality standards, provided permittees comply with all applicable Section 401 conditions." J.A. 452.

C.    Virginia's Approval of MVP's Annual Standards and Specifications

MVP first submitted its standards and specifications to DEQ in February 2016. Over the course of more than a year, DEQ engaged in several written and in-person exchanges with MVP representatives before finally approving the standards and specifications for the Project in June 2017 ("*MVP's Standards and Specifications*"). They identify the measures MVP will take to meet the substantive requirements of the VESC and VSM Laws. They also outline how MVP will meet FERC's requirements regarding its *Upland Erosion Control, Revegetation, and Maintenance Plan* and *Wetland and Waterbody Construction and Mitigation Procedures*.

The approved standards and specifications include, among other things, plans to protect against impacts from landslides and blasting, requirements for addressing acidic silt, and assessing karst hazards. They also require MVP to monitor land-disturbing activities, conduct regular inspections, and report the results to DEQ. The technical requirements in *MVP's Standards and Specifications* in fact exceed in several respects the requirements that the Virginia Construction General Permit imposes generally on large-scale construction projects.[8]

---

[8]    For example, the standards and specifications require MVP to (1) install permanent waterbars and slope breakers in some locations 25 feet from waterbody boundaries, (2) install temporary berms and trench breakers to slow stormwater flowing along a right-of-way or trench, (3) reduce the width of the construction area for the 50 feet on each side of a waterbody where possible, (4) restrict the undertaking of equipment (Continued)

22

In addition to these requirements, DEQ also informed MVP that it needed to submit site-specific plans to DEQ for its approval before commencing land-disturbing activities. These plans would "address every foot of land disturbance related to pipeline construction, including the path of the proposed pipeline right of way . . . , access roads, construction lay-down areas and construction activities that will occur in streams and wetlands." J.A. 108. Additionally, DEQ required MVP to post these plans on its website so that the public could comment on them.

D.     Virginia's Section 401 "Supplemental Proceedings"

On May 19, 2017, the same day DEQ issued the 2017 Guidance Document, it also issued an information request to MVP pursuant to the new policy. The request stated that it was "for the purpose of evaluating whether additional 401 certification conditions are necessary to ensure protection of water quality." J.A. 7. Included in the many categories of information requested were "[a] complete listing of all type of project-related upland ground-disturbing activities that would occur within 50 feet of" surface waters; a list of sensitive waterbodies located within 50 feet of the land-disturbing activities; and information concerning various measures MVP would be taking to protect water quality, including a water-quality monitoring plan. J.A. 8. DEQ's request marked the beginning of a supplemental process that involved many detailed exchanges of information between

maintenance, storage, and refueling activities within 100 feet of any waterbody, and (5) disc and de-compact topsoil in disturbed areas during restoration of rights-of-way.

23

DEQ and MVP, as well as in-person work sessions involving representatives of various other state agencies.

On July 3, 2017, DEQ issued a draft 401 certification that included 14 conditions that had not been included in the April 401 Certification (for the Corps' 404 permit). The draft was shared with the public subject to DEQ's notice and comment procedures, generating more than 8,000 comments. DEQ also held two public hearings regarding the certification. As this process continued, DEQ and MVP continued to discuss more water-quality related concerns, what measures would be employed to address the concerns, and how effective those measures would be. DEQ also entered into a contract with the United States Geological Service to monitor water quality during construction.

As a result of this continued review, DEQ substantially revised its draft 401 certificate, adding several new requirements. The revised draft included 15 conditions that were in addition to the many other requirements imposed by the various other governmental entities and laws. Those conditions included "specific requirements for best work practices emphasizing hazard assessment, frequent inspection requirements, monitoring activities, preventative measures, riparian buffer protections, and comprehensive mitigation plans." J.A. 130.

In addition to preparing the revised draft certification, DEQ prepared other documents explaining its analysis, including a "Basis for Certification" and detailed responses to the public's comments. DEQ also further explained its analysis when it presented its recommendation to the Board during a two-day public meeting in December 2017.

24

As noted, the certification process required Virginia to determine that it had "reasonable assurance" that the Project would "not violate applicable water quality standards." 40 C.F.R. § 121.2(a)(3). DEQ recognized that "[t]he term 'reasonable assurance' is not defined in the [CWA] or applicable federal regulations." J.A. 124. It reasoned that the standard "addresses future events" and thus is "inherently predictive in nature and absolute certainty is not required." J.A. 103 n.4, 125. Still, DEQ reasoned that the term requires "more than a probability or mere speculation. J.A. 103 n.4, 125. DEQ concluded that, with all of the additional conditions imposed in the proposed Section 401 certification, that standard was met.

DEQ noted that application of the VESC and VSM Laws through the annual standards and specification program would serve "to protect surface water quality during and after construction completion." J.A. 107. DEQ also emphasized that the supplemental 401 review was only one of many programs and processes protecting Virginia's water quality, each of which DEQ participated in. These programs and processes included FERC's environmental review; the CWA section 404 certification and related VWP permitting programs; DEQ's review of stormwater and erosion control measures through the VESC and VSM Laws; DEQ's supplemental Section 401 review of impacts of upland activities; and DEQ's participation in the development of project-specific water-quality monitoring requirements. DEQ concluded that these programs, "[w]hen considered as a unified approach, . . . provide a thorough technical evaluation

25

and process that is designed to ensure that Virginia's water quality is protected." J.A. 113.[9]

DEQ noted that in the process that culminated with issuance of the April 401 Certification, DEQ had "already established reasonable assurance that activities in streams and wetlands" would "be conducted in a manner that [would] not violate applicable water quality standards." J.A. 126. Reviewing the potential impact of the stream-crossing activities that were covered by NWP 12, DEQ emphasized that the permit requires the use of appropriate erosion and sediment controls. DEQ also emphasized that NWP 12 requires, with regard to any stream crossing, that any disturbance will only be temporary and that the impact area must be restored to pre-construction condition once construction is complete. DEQ also noted that "[t]he VWP program and prior certification of the Corps' Nationwide Permits has proven to be sufficient to evaluate and, when necessary, mitigate potential water quality impacts for linear construction projects, such as roads and pipelines." J.A. 100.

DEQ acknowledged that its review of the project-specific stormwater management and erosion and sediment control plans – the description of exactly how the annual standards and specifications would be applied foot-by-foot within the Project – would not be completed until after completion of Virginia's Section 401 process. Nevertheless, DEQ's reasonable-assurance determination of the upland activities depended in part on

---

[9] The document explained that the earlier-issued 401 certification for the Corps' Nationwide Permit and the additional proposed 401 certification "*together* would constitute the Commonwealth of Virginia's 401 Certification for the MVP Project." J.A. 103 (emphasis in original).

the facts (1) that no land-disturbing activity could begin until those plans had been approved, and (2) that the plans would not be approved unless they satisfied *MVP's Standards and Specifications*, which DEQ had already determined complied with the applicable statutory and regulatory requirements. DEQ also noted that Virginia's AS&S Program "incorporates the same engineering, erosion and sediment control, recordkeeping, monitoring, inspecting and post construction stormwater management requirements that are otherwise implemented in the . . . Construction General Permit (9 Va. Admin. Code § 25-880-1 *et seq.*)." J.A. 126. DEQ drew assurance from the fact that a Richmond Circuit Court had recently upheld the Construction General Permit on the basis that "substantial evidence in the record [supported] the Board's determination that proper implementation of permit conditions, including inspections and corrective action, would protect water quality." J.A. 127; *see* Order, *Kelble v. Commonwealth*, Case No. CL14-762, at 4-5 (Richmond Cir. Ct. Apr. 10, 2017) (concluding in appeal challenging whether Construction General Permit adequately protected water quality that substantial evidence supported Board's determination that proper implementation of the conditions of the permit, including inspections and adaptive actions, would protect water quality). And DEQ placed strong reliance on the EPA's conclusion that its own construction general permit was sufficient to prevent projects from negatively affecting water quality. DEQ emphasized that it "traditionally rel[ies] on the technical studies and analysis of [the] EPA" because DEQ lacks the money or manpower to do the "in-depth analyses" that the EPA does. J.A. 305.

DEQ concluded,

27

In the absence of information demonstrating otherwise, compliance with the requirements under the [AS&S] Program will result in stormwater discharges being controlled as necessary to meet applicable water quality standards and antidegradation requirements. More specifically, by imposing requirements that discharges to impaired, TMDL [Total Maximum Daily Load], and exceptional waters comply with additional requirements, to stabilize exposed areas faster and to conduct site inspections more frequently than other sites (in addition to meeting [stormwater and erosion] requirements), authorizing these discharges will not result in a lowering of water quality. Thus, DEQ has determined that compliance with the [AS&S] approval generally is sufficient to satisfy Tier 2 and Tier 3 antidegradation requirements because the controls will not result in a lowering of water quality, making individualized Tier 2 or Tier 3 review unnecessary.

J.A. 128-29. The DEQ added that its determination that the AS&S Program would ensure compliance with water quality standards and antidegradation requirements was supported by the fact that the requirements under that program met the technical requirements of the Construction General Permit and that the EPA had stated in its 2017 Construction General Permit fact sheet that compliance with that permit was generally sufficient to prevent any lowering of water quality. *See* J.A. 1075 ("EPA has determined that compliance with the [Construction General Permit] generally will be sufficient to satisfy Tier 2 (or 2.5) and Tier 3 antidegradation requirements because the controls will not result in a lowering of water quality, making individualized Tier 2 or Tier 3 review unnecessary.").

DEQ also noted that FERC had concluded – prior to Virginia's adding any conditions in the Section 401 process – that impacts on water resources were "expected to return to baseline levels over a period of days or weeks following construction given the requirement to restore water bodies to their original contours." J.A. 132. Given that fact,

28

and the fact that the Corps' approval would be necessary regarding any stream or wetlands crossings, "FERC [had] concluded that the cumulative effect on surface waterbody resources would be minor." J.A. 132. Similarly, DEQ took notice of the fact that the Corps would be assessing in detail "geographic areas that are determined to be potentially subject to more than minimal cumulative adverse environmental effects," and the Corps will have authority to add conditions to NWP 12 "to require mitigation measures to ensure that the cumulative adverse environmental effects of these activities are no more than minimal." J.A. 133-34.

Finally, DEQ emphasized that the proposed 401 certification required MVP to develop a limited water-quality monitoring plan to monitor and evaluate potential impacts from activities not subject to the Corps' Section 404 permit. DEQ noted that the plan MVP submitted included in-stream monitoring of water quality in proximate upland areas. The monitoring would occur before, during, and after construction, and would evaluate temperature, turbidity, dissolved oxygen, and pH. Elevated sample results "that exceed the applicable water quality criteria" would require consultation between MVP and DEQ so that they could respond appropriately. J.A. 92. In addition to this monitoring, DEQ noted it would be conducting "project-specific water quality monitoring at a number of proposed . . . stream crossings near sensitive and/or critical areas" that also "will be conducted before, during and after . . . construction activities." J.A. 139. DEQ noted that the monitoring had already begun in the fall of 2017 in order "[t]o establish a baseline of water quality conditions," and that it would continue if the project were approved until "at least one year after completion of construction." J.A.

29

140. DEQ stated that "[t]he monitoring is intended to provide reasonable assurance that erosion and sediment control measures are effective" and that "[i]f necessary, changes will be made to approved erosion and sediment control plans based on conditions encountered in the field during construction." J.A. 140.

During the two-day meeting held by the Board to consider DEQ's recommendation, the Board further amended the draft certificate, including adding one additional condition. The Board approved the certificate as amended, and on December 8, 2017, DEQ issued a final certification (the "December 401 Certification"). The certification stated that it "addresses Project activities in upland areas outside of the Corps jurisdictional areas under 33 U.S.C. § 1344 and water withdrawal activities that are exempt from coverage under the Virginia Water Protection Permit Program Regulation (9 [Va. Admin. Code] § 25-210-10, *et seq.*)."[10] J.A. 48. The certification declared that "[t]he additional conditions contained in . . . this Certification along with the requirements imposed by the VWP regulation, the Corps Section 404 permitting requirements, and prior regulatory actions associated with the approval and requirements

---

[10] The certificate continued:

In the manner and to the extent described herein, this includes all proposed upland activities associated with the construction, operation, maintenance, and repair of the pipeline, any components thereof or appurtenances thereto, and related access roads and rights-of-way as well as certain project-related surface water withdrawals. This Certification covers all relevant upland Project activities within the route identified in the Environmental Impact Statement.

J.A. 48.

30

of the June 2017 Annual Standards and Specifications, and the April 7, 2017 Section 401 Water Quality Certification of the Corps Nationwide Permit 12 provide reasonable assurance that water quality standards will not be violated." J.A. 53.

E.      Petitions For Review and Subsequent Events

On December 8, 2017, and December 18, 2017, separate petitions for review were filed by various entities challenging the December 401 Certification. Both petitions named the Board, the Board's members, DEQ, DEQ's Director, and DEQ's Director of its Water Permitting Division as respondents ("Respondents"). We subsequently consolidated the petitions and granted MVP's motion to intervene.

On December 26, 2017, the Corps' Norfolk District verified that MVP could rely on NWP 12 for its stream crossings. FERC began issuing notices to proceed with construction on January 22, 2018.

III.

As noted earlier, section 717r of the NGA provides appellate jurisdiction over a state administrative agency's grant of a Section 401 certificate, in "[t]he United States Court of Appeals for the circuit in which a facility subject to [15 U.S.C. §717f] is proposed to be constructed, expanded, or operated." 15 U.S.C. § 717r(d)(1). And it is undisputed here that the Project is subject to 15 U.S.C. § 717f. Nevertheless, Respondents and MVP both argue that Petitioners lack standing to litigate this petition for review. We disagree.

Article III gives federal courts jurisdiction only over "[c]ases" and "[c]ontroversies." U.S. Const. art. III, § 2, cl. 1. "One essential aspect of this

31

requirement is that any person invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). To establish Article III standing, Petitioners must allege that (1) they suffered an actual or threatened injury that is concrete, particularized, and not conjectural; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547-48 (2016).

Petitioners are individuals and other entities who allege the construction of the pipeline would cause them (or their members) injuries related to their various interests in the affected waters. Although Respondents and MVP do not dispute that Petitioners sufficiently allege that they will be harmed by construction of the Project, they nevertheless contend that Petitioners cannot establish any of the three standing prongs. Respondents and MVP contend it was FERC's granting of its permit that caused any injuries that Petitioners are suffering insofar as it was FERC's permit that allowed the Project to proceed. MVP also argues that even were Petitioners to prevail on the merits and we were to vacate the December 401 Certificate and remand for further proceedings, Petitioners would need to clear several additional hurdles to eventually obtain the ultimate relief that they seek, namely, more stringent certificate conditions or complete discontinuation of the Project.

The standing principles that control here are those we applied in *Townes v. Jarvis*, 577 F.3d 543, 547 (4th Cir. 2009). In that case, the Virginia Parole Board found prisoner Townes ineligible for discretionary parole pursuant to a three-strikes statute. *See id.* at 545-46. After he was denied state habeas relief, he filed a federal habeas petition,

32

claiming that the parole-ineligibility determination violated his due process and equal protection rights. *See id.* at 546. The district court dismissed the petition. *See id.* We granted a certificate of appealability on both claims. *See id.* A threshold question in the appeal was whether Townes's case was mooted by his release from prison on mandatory parole while his appeal was pending. We concluded that the case was not moot because each standing element remained satisfied. *See id.* at 546-49.

We concluded that Townes properly asserted injury-in-fact insofar as the parole-ineligibility decision cost him *the opportunity* to receive a shorter period of parole. *See id.* at 547. We reasoned that were he found to be eligible for parole, he would receive a discretionary parole hearing, which would be the opportunity for a shorter parole period. *See id.* Because it was the parole board's parole-ineligibility decision that deprived Townes of a discretionary hearing, we concluded his injury was fairly traceable to the parole-ineligibility decision. *See id.* Furthermore, Towne's lost-opportunity injury was redressable insofar as a favorable decision on the merits could result in him receiving a discretionary parole hearing. *See id.*

We noted that to establish redressability, Townes did not need to show that his obtaining a discretionary parole hearing would likely result in a shortened parole period. *See id.* We explained,

> In some cases, like the one at hand, a plaintiff will seek *immediate* relief from a federal court as a necessary antecedent to the *ultimate* relief he seeks from a different entity, like an administrative agency. In these situations, to meet the redressability prong, a party must demonstrate that a favorable decision from the federal court likely would provide him immediate relief, but need not demonstrate that it likely would provide him the ultimate, discretionary relief sought from the agency.

33

*Id.* (emphasis in original) (citing *FEC v. Akins*, 524 U.S. 11, 25 (1998)).  We explained that "to require a showing of likelihood of ultimate relief in this situation would involve courts in the speculative (if not impossible) task of predicting how an agency will exercise its discretion."  *Id.* at 548.  Still, we noted that the prospect of the plaintiff's achieving the ultimate relief he seeks is not altogether irrelevant to the issue of redressability: "[I]f no realistic possibility exists that a plaintiff can obtain the ultimate relief," then he cannot show redressability.  *Id.* (internal quotation marks omitted).

The facts of the present case are closely analogous to those of *Townes*.  As in *Townes*, Petitioners challenge what they claim is an improper administrative decision that they had hoped and expected would yield a more favorable result.  Also as in *Townes*, they seek "*immediate* relief from a federal court as a necessary antecedent to the *ultimate* relief [they] seek[] from a different entity, like an administrative agency."  *Id.* at 547 (emphasis in original).  We therefore analyze the standing issue here applying the same principles we used in *Townes*.

Applying these principles, we conclude Petitioners have standing.  Just as the board's parole-ineligibility decision ended Townes's opportunity to receive a discretionary parole hearing (and the shorter parole period he would have hoped to receive from that hearing), the December 401 Certification ended Petitioners' opportunity to have more stringent requirements imposed (or the Project vetoed entirely).  Thus, like Townes, Petitioners have properly asserted injury-in-fact fairly traceable to the decision they challenge.  And also like Townes, were Petitioners to prevail on the merits of their claims in federal court, the court could immediately undo the administrative decision that

34

caused their injury. As was true in *Townes*, analyzing redressability does not require us to predict whether, if we rule for Petitioners on the merits, they will eventually obtain the ultimate relief that they seek.[11] Rather, to show redressability, they need only demonstrate a "realistic possibility" that they will obtain that ultimate relief. *Id.* at 548 (internal quotation marks omitted).

As MVP points out, in order to obtain the relief Petitioners ultimately seek – tighter restrictions or a complete discontinuation of the Project – Petitioners would need to clear several hurdles even after prevailing on the merits before us. At the very least, they would need the State Agencies to decide on remand not to elect to waive any further review. *See* 33 U.S.C. § 1341(a). Then they would need the State Agencies to decide to deny reissuance of the 401 certification or at least to impose stricter conditions. And as MVP points out, even if the State Agencies decided to take that course, FERC theoretically could resist their efforts by arguing, for example, that it is too late in the

---

[11] Citing *Doe v. Virginia Department of State Police*, 713 F.3d 745, 755 (4th Cir. 2013), MVP suggests that to show redressability, Petitioners must show it is *likely* they would obtain their ultimate relief should we rule for them on the merits of their petition. But *Doe* does not apply here. In *Doe* we explicitly concluded that the redressability rule of *Townes* did not apply because the plaintiff did not meet the criteria for applying the rule, namely she was *not* "seek[ing] immediate relief from a federal court as a necessary antecedent to the ultimate relief [s]he seeks from a different entity, like an administrative agency." 713 F.3d at 756 n.7 (internal quotation marks omitted). Because Petitioners here *are* seeking such relief, they are entitled to the benefit of the *Townes* rule and thus do not need to show they will likely eventually obtain the ultimate relief in order to show redressability.

35

process for the State Agencies to make such a decision or that further restrictions would be preempted.

In our view, however, none of these potentialities are sufficient to negate the "realistic possibility" that if Petitioners prevailed on the merits of this petition, they would obtain at least more stringent requirements on remand. Petitioners argue that FERC would be legally required to add any conditions requested by the State Agencies on remand or to honor a decision by the State Agencies to deny 401 re-certification. But even assuming Petitioners are incorrect, and FERC had some discretion on the subject, there is good reason to believe FERC would be amenable to the State Agencies' attempts to re-issue its 401 certification with more stringent restrictions. FERC's certificate plainly gave the OEP Director discretion to stop construction or to impose additional conditions for protection of the environment.[12] And, FERC has general authority to issue supplemental orders in any event. *See* 18 C.F.R. § 153.11 (FERC "may make, at any time subsequent to the original order of authorization, after opportunity for hearing, such supplemental orders implementing its authority under section 3 of the Natural Gas Act as it may find necessary or appropriate.").

If the State Agencies determined on remand that additional conditions would be needed to give them reasonable assurance that their water quality would be protected, they would have strong arguments to make that FERC could not, or at least should not,

_____

[12]     Moreover, Virginia's certificate expressly recognized that it could be revoked, even though judicial vacatur was not specifically referenced as a basis for revocation.

36

stand in their way. It is undisputed, after all, that so long as the state does not waive the right to participate, a state's grant of a Section 401 certificate is a precondition for FERC's ability to issue its certificate. *See* 33 U.S.C. § 1341(a)(1) (providing that applicant for a FERC permit "shall provide" FERC with a Section 401 Certificate, and "[n]o license or permit shall be granted until the certification required by this section has been obtained or has been waived"); *see also* 33 U.S.C. § 1341(d) ("Any [Section 401] certification . . . *shall* become a condition on any Federal license or permit subject to the provisions of this section." (emphasis added)); *American Rivers, Inc. v. FERC*, 129 F.3d 99, 107 (2d Cir. 1997) (explaining that Section 401's language "leav[es] little room for FERC to argue that it has authority to reject state conditions it finds to be *ultra vires*").

MVP is no doubt correct that, were FERC inclined to resist the State Agencies' efforts, it would have colorable arguments it could assert as well. And for that reason, we cannot say with certainty how FERC would react. Fortunately, however, it is not our role to engage "in the speculative (if not impossible) task of predicting how an agency will exercise its discretion." *Townes*, 577 F.3d at 548. Rather, it is sufficient for us to conclude, as we do here, that there is at least a realistic possibility that the State Agencies would successfully impose more restrictive conditions (or deny re-certification) were we to vacate the December 401 Certification. We therefore determine that the possibility Petitioners could prevail on the petition before us and yet still not obtain the relief they ultimately seek does not preclude them from showing redressability. Rather, we hold that Petitioners have demonstrated standing to assert the claims contained in their petition for review, and it is to those claims that we now turn.

37

IV.

A.

We review Virginia's Section 401 certification under the arbitrary-and-capriciousness standard.[13] *See AES Sparrows Point LNG, LLC*, 589 F.3d at 733. "[T]he scope of our review under [that] standard is narrow and highly deferential." *Id.* "Especially in matters involving not just simple findings of fact but complex predictions based on special expertise, 'a reviewing court must generally be at its most deferential.'" *Ohio Valley Envtl. Coal.*, 556 F.3d at 192 (quoting *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983)).

> In determining whether agency action was arbitrary or capricious, the court must consider whether the agency considered the relevant factors and whether a clear error of judgment was made. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made.

*Id.* at 192 (internal quotation marks and citations omitted).

B.

---

[13] Petitioners argue for application of this standard. And Respondents acknowledge that "courts reviewing challenges under Section 401 – including this Court – have often looked to the APA [Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(A)]" and applied the arbitrary-and-capricious standard of review. Respondents' brief at 27. Nevertheless, they question whether this approach is correct given that the APA "does not cover state agencies." *Delaware Riverkeeper Network v. Secretary of Pa. Dep't of Envtl. Prot.*, 870 F.3d 171, 179 n.8 (3d Cir. 2017); *see* 5 U.S.C. § 701(b)(1). They suggest that Virginia law should supply the standard, which they maintain would require application of the substantial-evidence standard of review. We need not resolve this issue, however, because Petitioners' claims fail even under their preferred standard.

Petitioners argue, for two reasons, that the State Agencies acted arbitrarily and capriciously in issuing the December 401 Certificate.

1.

First, they contend that DEQ did not have a sufficient basis to find reasonable assurance that the types of measures, restrictions, and programs in place to prevent excess sediment from entering state waters would be effective to satisfy the requirements of Virginia's antidegradation policy. We disagree.

The construction of the Project was exactly that, a large construction project, and the State Agencies very reasonably undertook to protect their waters with the "tried and true" methods developed for just this purpose. Indeed, *MVP's Standards and Specifications* incorporate the very same substantive protections as are contained in the Virginia Construction General Permit. The State Agencies justifiably drew confidence in these protections from the EPA's judgment regarding the effectiveness of these same protections in preventing construction from negatively impacting water quality. And a Richmond Circuit Court concluded as well that the Virginia Construction General Permit was sufficient to prevent any negative impacts on water quality. *See* Order, *Kelble v. Commonwealth*, Case No. CL14-762, at 4-5 (Richmond Cir. Ct. Apr. 10, 2017).

Petitioners nonetheless contend, for several reasons, that the State Agencies acted arbitrarily in relying on the EPA's judgment regarding the general effectiveness of these protections. They argue, for example, that interstate gas pipelines "can have significantly greater impacts than the smaller projects authorized by EPA's General Permit." Petitioners' Reply brief at 19. But Petitioners do not suggest any reason why it was

39

arbitrary for the State Agencies to assume that those same methods used for years to prevent large construction projects from harming water quality would not continue to be effective on an even larger scale.

Petitioners also argue that the federal General Permit has an element that is not present with regard to the Project here because, "[u]nlike the NPDES program, the [VESC] Law under which the [AS&S] are approved does not mandate compliance with water quality standards." Petitioners' Reply brief at 19-20. However, while *MVP's Standards and Specifications* do not directly incorporate Virginia's water quality standards, the December 401 Certification incorporates MVP's water-quality monitoring plan. That plan in turn requires MVP to promptly report any sampling results "that exceed the applicable water quality criteria," so that DEQ and MVP can quickly engage in consultation and make appropriate adjustments. J.A. 92. As DEQ explained to the Board, it is of course true that Section 401 certifications are "inherently predictive in nature." J.A. 103 n.4, 125. *See Port of Seattle v. Pollution Control Hearings Bd.*, 90 P.3d 659, 679 (Wash. 2004) ("[A] finding of 'reasonable assurance' is predictive in nature."). *Cf. Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493, 501 (4th Cir. 2005) (noting in context of section 404 that "it is impossible for the Corps' *ex ante* determinations of minimal impact to be anything more than reasoned predictions"). Nonetheless, it was reasonable for the State Agencies to conclude that DEQ, like the EPA, would be able to use the tools at its disposal to adjust to any unexpected contingencies that may lead to a short-term exceedance. We note that § 1341(d) plainly contemplates a state requiring water monitoring as a basis for its reasonable assurance

40

certification. *See* 33 U.S.C. § 1341(d) ("Any certification provided under this section shall set forth any . . . monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable . . . limitations . . . and with any other appropriate requirement of State law set forth in such certification."). We see no reason why reliance on such monitoring would be arbitrary or capricious. *See Port of Seattle*, 90 P.3d at 678.[14]

In their opening brief, Petitioners argue that even quick adjustments by DEQ to minor exceedances would necessarily be insufficient to "maintain[] and protect[]" Tier 2 water quality, as Virginia's antidegradation policy requires. 9 Va. Admin. Code 25-260-30(A)(2). Petitioners argue that allowing *any* additional discharge of sediment to Tier 2 waters, no matter how small in quantity or temporary in duration the exceedance is, would violate DEQ's duty to "maintain[] and protect[]" water quality in these waters. *Id.*

As Respondents and MVP both noted in their response briefs, however, the State Agencies do not construe their antidegradation policy so rigidly. Rather, they take the

---

[14] For similar reasons, we conclude it was not arbitrary for the State Agencies to issue the December 401 Certificate before the site-specific erosion and stormwater management plans were finalized. Just as the existence of the plan to monitor water quality during construction was an important part of its reasonable assurance *even though construction had not yet begun*, the requirement that DEQ approve the site-specific plans was important *even though the plans had not been finalized*. *See Port of Seattle v. Pollution Control Hearings Bd.*, 90 P.3d 659, 677 (Wash. 2004) (holding regulators did not act arbitrarily or capriciously by basing reasonable assurance "on future submissions of revised plans, reports, and studies, so long as their implementation and anticipated outcome meet the reasonable assurance test"). Although the significance of both of these protections depended upon DEQ's *future* responses to *future* events, we do not believe it was arbitrary for the State Agencies to trust that DEQ officials would respond appropriately.

41

view that they can still "maintain[] and protect[]" water quality despite momentary exceedances so long as they can quickly detect such exceedances and promptly respond with appropriate changes in to prevent any *significant* degradation. *See* Va. Dep't of Envtl. Quality, Guidance Memo No. 00-2011, Guidance on Preparing VPDES Permit Limits (Aug. 24, 2000), at 9 ("Since the quality of tier 2 waters is better than required by standards, no *significant* degradation of the existing quality will be allowed." (emphasis added)). We defer to the agencies' reasonable construction of their own regulations. *See Delaware Riverkeeper Network v. Secretary of Pa. Dep't of Envtl. Prot.*, 870 F.3d 171, 181 (3d Cir. 2017); *Clark v. Alexander*, 85 F.3d 146, 152 (4th Cir. 1996). And Petitioners do not challenge the reasonableness of DEQ's construction here. *Cf.* Petitioners' Reply brief at 17-18 (acknowledging DEQ's construction).

Certainly, it must be anticipated with large construction projects, that unexpected problems will arise, leading at least to minor, short-term issues. Were Virginia's policy interpreted as rigidly as Petitioners suggest, no project affecting Tier 2 waters could ever be approved without an economic/social development need analysis. *See* 9 Va. Admin. Code § 25-260-30(A)(2) (providing that the quality of Tier 2 waters "shall be maintained and protected unless the board finds . . . that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters

42

are located"). Especially given this reality, we find nothing unreasonable in DEQ's interpretation of the policy.[15]

Petitioners also maintain that the State Agencies acted arbitrarily by relying on EPA's judgment regarding the general effectiveness of the type of protections in place for the Project rather than taking a more site-specific approach. Petitioners point to evidence in the record supporting their view that the protections in place here would not be effective in preventing construction impacts from lowering water quality given the specific characteristics of the Project, particularly the steep topography of the land at issue.[16] But we conclude that the State Agencies' approach appropriately blended site-specific and non-site specific analyses. The December 401 Certification incorporates a *Landslide Mitigation Plan.* For example, as DEQ explained in its response to public comments to its draft certification,

---

[15] Respondents also point out that Tier 3 waters receive the "highest level of protection," 63 Fed. Reg. 36742-01, at 36786 (July 7, 1998), and even in those waters, "[a]ctivities causing temporary sources of pollution may be allowed . . . even if degradation may be expected to temporarily occur provided that after a minimal period of time the waters are returned or restored to conditions equal to or better than those existing just prior to the temporary source of pollution." 9 Va. Admin. Code § 25-260-30(A)(3)(b)(3).

[16] For example, they point to one particular study that concluded that sedimentation at one crossing affected by the Project would increase by 1,536 percent during construction even with best management practices and would permanently increase sedimentation by 15% even after reclamation and revegetation. They also cite several analyses from a hydrologist who concludes that MVP's best management practices would not in fact be sufficient to prevent significant adverse impacts to the state's water quality. And they point to evidence that other pipelines built in less challenging terrain that have caused substantial water quality impacts.

43

Plan development included field observations for these sites including: slope characteristics, GPS mapping of observed slides, slumps, rockfalls, scarp locations, the presence of geotropically affected trees, drainage features, and gullying. The Plan includes mitigation strategies such as excavation and/or regarding of upgradient head soils, dewatering, rock embedment as well as construction operations including buttressing and reinforced soil slope.

Landslide mitigation also will depend on the installation of appropriate drainage and erosion control measures during construction and proper right-of-way reclamation. Certain site-specific measures have already been identified for certain high risk areas and others will be applied as field conditions indicate the need.

J.A. 138.

Moreover, DEQ has emphasized that it "traditionally rel[ies] on the technical studies and analysis of the EPA" because DEQ lacks the money or manpower to do the "in-depth analyses" that the EPA does. J.A. 305. While it is always true that government agencies could undertake analysis that is more in-depth and more specific to a particular project, we do not believe the State Agencies acted arbitrarily in placing significant reliance on the effectiveness of its "tried and true" methods here. In making this judgment, we cannot ignore the fact that the State Agencies vigorously participated at every stage of the decision-making process and did not issue their final 401 certificate until they had added all of the protections that they concluded were needed to give them reasonable assurance that state water quality would be protected. This is exactly how the system was designed to work.

At its essence, Petitioners' position is that, having chosen to participate in the process, Virginia was foreclosed from placing significant reliance on the judgment of federal agencies regarding the general effectiveness of the types of protections in place

44

here and was limited in the types of evidence on which it could base its reasonable-assurance certification. We see no reason why Virginia should be so hamstrung. And we see no purpose we would serve by stepping in and second-guessing the analytical methods Virginia deemed appropriate to provide it with reasonable assurance that its water quality would be protected.

2.

Petitioners (and amicus Chesapeake Bay Foundation) also challenge the State Agencies' decision to analyze the impacts from activities covered by NWP 12 separately from the impacts from upland activities related to construction. In light of this segmentation, Petitioners maintain that issuance of the December 401 Certification was arbitrary and capricious because the State Agencies "fail[ed] to consider the combined effect of the upland activities and the stream and wetland crossings." Petitioners' Opening brief at 35. We disagree.

We note initially that the petition for review here challenges only the December 401 Certification. There is thus no argument before us that the State Agencies improperly limited the scope of their April 401 Certification to the impact of activities covered by NWP 12. What we do consider today is Petitioners' argument that the State Agencies erred by not including the impact of activities covered by NWP 12 within the scope of their supplemental 401 process.

We find this criticism to be unfounded. Contrary to Petitioners' suggestion, DEQ "did not review the Project's potential upland impacts in a vacuum." MVP's brief at 51. Rather, DEQ "fully integrated [its earlier] analysis into its review of upland impacts."

45

MVP's brief at 50. Indeed, DEQ explained in its "Basis for Certification" that it was its intention that the April 401 Certification for the activities covered by NWP 12 and the additional proposed 401 certification "*together* would constitute the Commonwealth of Virginia's 401 Certification for the MVP Project."[17] J.A. 103 (emphasis in original). DEQ's analysis in the supplemental process included consideration of the impacts the activities covered by NWP 12 were expected to have. Thus, although the December 401 Certification "addresse[d] only activities in upland areas," J.A. 48, and determined that there was reasonable assurance that *allowing these activities* would not reduce water quality, DEQ made this determination with full awareness and consideration of the fact that the NWP 12-covered activities would also be occurring. And in the end, DEQ made clear that it was only "[t]he additional conditions contained in Section V of the draft certification *along with the requirements imposed by the VWP regulation, the Corps Section 404 permitting requirements*, and prior regulatory actions associated with the approval and requirements of the June 2017 [Annual Standards and Specifications]," that "provide[d] reasonable assurance that water quality standards will not be violated." J.A. 113 (emphasis added). Finally, as we have discussed, a significant basis for the State Agencies' reasonable-assurance certification was the existence of monitoring

---

[17] The April 2017 Certification concerned only "activities permitted under the Corps' NWP program." J.A. 452. As the Board was considering whether to approve the issuance of a Section 401 certification for upland activities, several Board members made clear that they wanted to ensure that the language of that certificate would not foreclose the Board from participating in any future Section 401 process if the Corps decided to issue individual permits as opposed to relying entirely on coverage under NWP 12.

requirements that would allow DEQ to make prompt adjustments if samples revealed exceedances of pre-construction sedimentation levels. In this way, the monitoring plan protected against *any* degradation of water quality from the Project, without regard to what particular activities (or combination of activities) was the cause. For all of these reasons, we conclude that the State Agencies' segmented approach to the December 401 Certification, even if unorthodox, was not arbitrary and capricious.

## V.

In sum, because we conclude that the State Agencies did not act arbitrarily and capriciously in issuing the December 401 Certification, we deny the petition for review.

*PETITION FOR REVIEW DENIED*