**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1077**

APPALACHIAN VOICES; CHESAPEAKE CLIMATE ACTION NETWORK; SIERRA CLUB; WILD VIRGINIA, INC.; COWPASTURE RIVER PRESERVATION ASSOCIATION; FRIENDS OF BUCKINGHAM; HIGHLANDERS FOR RESPONSIBLE DEVELOPMENT; JACKSON RIVER PRESERVATION ASSOCIATION; POTOMAC RIVERKEEPER, d/b/a Potomac Riverkeeper Network, Inc.; SHENANDOAH RIVERKEEPER, a program of Potomac Riverkeeper Network; SHENANDOAH VALLEY BATTLEFIELDS FOUNDATION; SHENANDOAH VALLEY NETWORK; VIRGINIA WILDERNESS COMMITTEE,

Petitioners,

v.

STATE WATER CONTROL BOARD; DAVID K. PAYLOR, Director, Virginia Department of Environmental Quality; ROBERT DUNN, Chair of the State Water Control Board; VIRGINIA DEPARTMENT OF ENVIRONMENTAL QUALITY; MELANIE D. DAVENPORT, Director, Water Permitting Division, Virginia Department of Environmental Quality,

Respondents,

ATLANTIC COAST PIPELINE LLC,

Intervenor.

**No. 18-1079**

CHESAPEAKE BAY FOUNDATION, INCORPORATED; ROBERT WHITESCARVER; JEANNE HOFFMAN,

Petitioners,

v.

STATE WATER CONTROL BOARD; MELANIE D. DAVENPORT, Director, Water Permitting Division, Virginia Department of Environmental Quality; ROBERT DUNN, Chair of the State Water Control Board; VIRGINIA DEPARTMENT OF ENVIRONMENTAL QUALITY; DAVID K. PAYLOR, Director, Virginia Department of Environmental Quality,

Respondents,

ATLANTIC COAST PIPELINE LLC,

Intervenor.

On Petition for Review of an Order of the Federal Energy Regulatory Commission. (17-002)

Argued: September 28, 2018                    Decided: January 14, 2019

Before GREGORY, Chief Judge, WYNN, and THACKER, Circuit Judges

Petition for review denied by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Wynn and Judge Thacker joined.

**ARGUED:** Benjamin Alan Luckett, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, for Petitioners. Toby Jay Heytens, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Respondents. Brooks Meredith Smith, TROUTMAN SANDERS LLP, Richmond, Virginia, for Intervenor. **ON BRIEF:** Gregory Buppert, Charmayne G. Staloff, Jonathan M. Gendzier, SOUTHERN ENVIRONMENTAL LAW CENTER, Charlottesville, Virginia, for Petitioners Cowpasture River Preservation Association, Friends of Buckingham, Highlanders for Responsible Development, Jackson River Preservation Association, Inc., Potomac Riverkeeper, Inc., Shenandoah Riverkeeper, Shenandoah Valley Battlefields Foundation, Shenandoah Valley Network, and Virginia Wilderness Committee. Joseph M. Lovett, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, for Petitioners Appalachian Voices, Chesapeake Climate Action Network, Sierra Club, and Wild Virginia. Jon Alan Mueller,

Margaret L. Sanner, Ariel Solaski, CHESAPEAKE BAY FOUNDATION, INC., Annapolis, Maryland, for Petitioners Chesapeake Bay Foundation, Inc., Jeanne Hoffman, and Robert Whitescarver. Mark R. Herring, Attorney General, Stephen A. Cobb, Deputy Attorney General, Donald D. Anderson, Senior Assistant Attorney General, J. Duncan Pitchford, Assistant Attorney General, David C. Grandis, Assistant Attorney General, Matthew R. McGuire, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Respondents. Andrea W. Wortzel, TROUTMAN SANDERS LLP, Richmond, Virginia, for Intervenor.

GREGORY, Chief Judge:

Pursuant to Section 401 of the Clean Water Act ("CWA"), the Virginia State Water Control Board ("Board") certified that it had reasonable assurance that activities related to the construction of a natural gas pipeline would not degrade the state's water resources. Environmental groups and their individual members disagreed with this certification, and they petitioned this Court to review the Board's decision. Because we conclude that the Board's Section 401 Certification for upland areas was not arbitrary and capricious, we deny the petition for review.

## I.

The Atlantic Coast Pipeline ("ACP"), a project developed and overseen by Atlantic Coast Pipeline LLC ("Atlantic"), is a proposed interstate natural gas pipeline, constructed by Atlantic, that will be approximately 604 miles long and 42 inches in diameter and will carry natural gas from Harrison County, West Virginia, to the eastern portions of Virginia and North Carolina. Approximately 307 miles of the ACP would traverse the Commonwealth of Virginia. There are a total of 890 water body crossings locations in Virginia, and the route of the ACP encompasses 74 migratory fish spawning waters or their tributaries. The proposed ACP access roads will intersect 89 Virginia rivers and streams and will require the clearing of thousands of acres in Virginia. To obtain approval for construction, Atlantic had to comply with the following federal and state laws and regulations relevant to this appeal.

4

As an initial matter, Atlantic had to comply with the Natural Gas Act ("NGA"). Under the NGA, a party is required to obtain authorization from the Federal Energy Regulatory Commission ("FERC") in the form of a certificate of public convenience and necessity to build or operate a natural gas pipeline. Upon receipt of an application for such a certificate, FERC undertakes a review of the environmental impacts of the proposed project under the National Environmental Policy Act ("NEPA") and the NGA. 42 U.S.C. §§ 4321 *et seq.*; 15 U.S.C. §§ 717 *et seq.* FERC accepts input from the public and then produces an environmental impact statement ("EIS"). Functioning as a "lead agency," FERC coordinates the required authorizations, including Virginia's water quality certification under the CWA. *See* 15 U.S.C. § 717n(b).

Because the pipeline project involves the discharge of fill and dredged materials into waterways and wetlands, Atlantic needed to obtain not only a certificate of public convenience and necessity from FERC, but also a Section 404 CWA authorization from the U.S. Army Corps of Engineers ("Army Corps"). *See* 33 U.S.C. § 1344(a); *AES Sparrows Point LNG, LLC v. Wilson*, 589 F.3d 721, 724 (4th Cir. 2009). The Army Corps provided the authorization necessary for the ACP through issuing Nationwide Permit 12, which covers "activities required for the construction, maintenance, repair, and removal of utilities lines and associated facilities in waters of the United States." *See* 33 U.S.C. 1344(e)(1) (allowing the Secretary of the Army to issue permits on a "nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in

nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment").

## III.

Atlantic was also required to obtain a Section 401 Certification. The NGA allows states to regulate the environmental impacts of pipelines under the CWA. *Delaware Riverkeeper Network v. Secretary Pa. Dep't of Envtl. Prot.*, 833 F.3d 360, 368 (3d Cir. 2016) (citing 15 U.S.C. § 717b(d)). Virginia exercises this regulatory authority through the Board. *See* Va. Code § 62.1-44.15. Pursuant to Virginia law, the Board wields broad powers regarding regulatory matters impacting water quality in Virginia, and Section 401 Certifications fall under its authority. *Id.* The Virginia Department of Environmental Quality ("DEQ") serves as the Board's staff, and the Board may assign DEQ tasks and delegate DEQ the authority to make decisions. *See* Va. Code Ann. § 62.1-44.14. We will refer to the Board and DEQ together as "the State Agencies" when their actions are in concert.

Under the Virginia Water Protection ("VWP") Program, the Board, after soliciting and considering public comment and consulting with relevant agencies, may issue a VWP permit "if it has determined that the proposed activity is consistent with the provisions of the Clean Water Act and the State Water Control Law and will protect in-stream beneficial uses." Va. Code Ann. § 62.1-44.15:20(B). The Board may also certify a nationwide Corps permit, such as Nationwide Permit 12, as meeting these requirements so long as the permit meets specified criteria. *See* 9 Va. Admin. Code 25-210-130(H).

6

Specifically, Section 401 states "[a]ny applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters" must seek "a certification from the State in which the discharge originates . . . that any such discharge will comply with the applicable provisions" of the CWA. 33 U.S.C. § 1341(a)(1). In addition, Section 401 states, "[n]o license or permit shall be granted if certification has been denied by the State." *Id.* If the state grants the Section 401 Certification — whether with or without conditions — it must contain "[a] statement that there is a reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards." 40 C.F.R. § 121.2(a)(3); *see PUD No. 1 of Jefferson Cty. v. Washington Dep't of Ecology*, 511 U.S. 700, 712 (1994). In addition, the regulations allow for Virginia to consider activities that impact the upland areas that may have the potential to affect water quality but do not fall under the scope of a VWP permit when the pipeline is over 36 inches inside diameter. Va. Code § 62.1-44.15:80.

## IV.

Atlantic applied for the certificate of public convenience and necessity from FERC and Section 404 authorization from the Army Corps in September 2015. Atlantic filed an amendment to its FERC certificate application in March 2016. In October 2017, FERC issued the certificate to Atlantic to construct and operate the pipeline. On April 7, 2017, the DEQ issued a Section 401 Certification for the wetland, river, and streams crossings as covered in the Section 404 Nationwide Permit 12. In May 2017, the DEQ explained that the Section 401 Certification for the Pipeline would entail two separate parts: (1) the

7

certification for the Army Corps Nationwide Permit 12, issued in April, applying to the Pipeline's wetland, river, and streams crossings (the "Wetlands and Streams Certification"), and (2) an additional Section 401 Certification review process to evaluate the "upland" impacts of the Pipeline, terrestrial areas that are not covered by the Army Corps Permit (the "Upland Certification"). Specifically, the Upland Certification would "include all proposed upland activities associated with the construction, operation, maintenance, and repair of the pipeline, any components thereof or appurtenances thereto, and related access roads and rights-of-way as well as certain project related surface water withdrawals." J.A 1083.

On November 9, 2017, the DEQ recommended that the Board approve a Section 401 Upland Certification of the project. On December 20, 2017, the Board issued the Upland Certification for the ACP with conditions. This Certification was distinct from the Wetlands and Steams Certification. This Upland Certification provided that it "shall be effective only following submission, review and final approval as required by law of the Karst Mitigation Plan, Annual Standards and Specifications, and Erosion and Sediment Control Plans and Storm Water Management Plans, and a report to the Board and the public by DEQ on the adequacy of these materials." J.A. 29.

Petitioners timely filed two petitions for review of the Certification on January 18, 2018. The petitions were consolidated by court order on January 31, 2018. We possess jurisdiction to review the Board's Section 401 Upland Certification pursuant to 15 U.S.C. § 717r(d)(1).

8

The petitioners contend the Board's issuance of the Section 401 Upland Certification was arbitrary and capricious and should be vacated for four reasons: (1) the State Agencies effectively invalidated their own finding of reasonable assurance when it voted to reopen the comment period on the Section 401 Certification of the Army Corps of Engineers Nationwide Permit 12; (2) the State Agencies arbitrarily and capriciously failed to assess the combined impacts on water quality that would result from multiple areas of construction activities within individual watershed areas; (3) the State Agencies arbitrarily and capriciously failed to conduct an adequate antidegradation review; and (4) the State Agencies arbitrarily and capriciously failed to ensure that the water quality in karst geology regions would be protected. Respondents and intervenor in turn deny that the State Agencies acted arbitrarily and capriciously and argue that the petitioners lack standing to bring this petition.

On April 12, 2018, the Board approved a second 30-day public comment period related to the Wetlands and Steams Certification. On August 21, 2018, the Board heard a presentation from the DEQ summarizing the public comment period and denied a motion to reevaluate this contested Certification.

## V.

The respondents and intervenor argue as an initial matter that petitioners do not have standing to litigate this petition for review. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) (Article III standing requires (1) an injury-in-fact (2) that is fairly traceable to the

challenged conduct of the defendant, and (3) that is likely to be redressed through a favorable judicial decision). We disagree.

This Court has previously rejected respondents' and intervenor's arguments on standing. *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 400-02 (4th Cir. 2018). Petitioners have established an injury-in-fact even though the State Agencies could choose to waive certification. We have previously held that the denial of an opportunity, in this case, to have the project vetoed or have additional restrictions can constitute an injury-in-fact. *Id.* at 401. In addition, petitioners successfully establish traceability and redressability given that we could vacate the Board's decision and determine that its decision was not based on a reasonable assurance and instead was arbitrary and capricious. Petitioners' injuries could be remedied if the Board required Atlantic to take additional measures that would address petitioners' grievances. In our previous decision we held petitioners established traceability and redressability in this very context. *Id.* Petitioners have demonstrated the requirements for standing.

## VI.

We review Virginia's Section 401 Certification under the standards set forth in the Administrative Procedures Act ("APA"). *See AES Sparrows Point LNG, LLC v. Wilson*, 589 F.3d 721, 727 (4th Cir. 2009).[1] This Court applies the arbitrary and capricious

---

[1] Asserting that the APA is not applicable to actions by State Agencies, respondents argue that Va. Code § 2.2-4027 establishes the applicable standard of review. That statute provides that issues of fact shall be decided based on "whether there was (Continued)

standard of the APA to the State Agencies' challenged findings and conclusions. *Sierra Club,* 898 F.3d at 403.

To survive review under the arbitrary and capricious standard, an agency decision must show that the agency examined "the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

> Agency action is arbitrary and capricious if the agency relies on factors that Congress did not intend for it to consider, entirely ignores important aspects of the problem, explains its decision in a manner contrary to the evidence before it, or reaches a decision that is so implausible that it cannot be ascribed to a difference in view.

*Bedford Cty. Mem'l Hosp. v. Health & Human Servs.*, 769 F.2d 1017, 1022 (4th Cir. 1985) (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). This Circuit has held that

> [r]eview under this standard is highly deferential, with a presumption in favor of finding the agency action valid. Especially in matters involving not just simple findings of fact but complex predictions based on special expertise, a reviewing court must generally be at its most deferential. In determining whether agency action was arbitrary or capricious, the court must consider whether the agency considered the relevant factors and whether a clear error of judgment was made. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. Deference is due where the agency has examined the

---

substantial evidence in the agency record to support the agency decision." As we did in *Sierra Club*, we decline to resolve this issue because petitioners' claims fail even under the substantial evidence standard. 898 F.3d at 403 n.13.

relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made.

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (internal quotation marks and citations omitted). Nonetheless, if a state agency's Section 401 certification is found to be arbitrary and capricious, the Court must vacate the certification. 5 U.S.C. § 706(2)(A).

## VII.

### A.

Turning to petitioners' first argument, we hold that the decision to reopen the comment period did not render the State Agencies' Section 401 Upland Certification arbitrary and capricious. The comment period was re-opened for the Wetlands and Streams Certification and not the Upland Certification at issue in this case. In any event, the Wetlands and Streams Certification was not ultimately revoked.

### B.

Moving to the petitioners' second argument, we conclude that the State Agencies' decision not to conduct a combined effect analysis does not render their issuance of a Section 401 Upland Certification arbitrary and capricious for three reasons.

First, the Section 401 Upland Certification in question deals with project-related activities taking place in upland areas. The Upland Certification supplemented the FERC certificate and the prior Wetland and Streams Certification of the Army Corps' Nationwide Permit 12 regarding waterways and utility line crossings. As the State

Agencies explained, "the conditions in the proposed additional 401 Certification are in addition to any other Federal or State permit or regulatory requirements including the expressed conditions imposed by FERC." J.A. 1059. The Upland Certification in question is not designed to function as a stand-alone document, comprehensively covering all pieces of relevant data and potentialities. For example, record evidence available to the State Agencies explains, "while the impacts to jurisdictional waters authorized by the Corps under Section 404 of the Clean Water Act are separate from upland activities that are the subject of this Certification, the Corps also analyzed the cumulative effects of linear utility projects and found that the individual and cumulative adverse effects on the aquatic environment resulting from the activities authorized by the Nationwide Permit 12 will be no more than minimal and each crossing is a single and complete project." J.A. 999. The Army Corps examined cumulative impacts, and it would be redundant and inefficient for the State Agencies to duplicate these efforts. The Upland Certification works in conjunction with other regulatory tools and cannot be judged in a void, and it supplements other pieces of the regulatory framework. It is not required to cover combined effect analysis because other parts of the regulatory process sufficiently address that subject matter. The State Agencies in the current appeal used their resources to issue the Upland Certification to fill an information gap regarding the impact of upland activities, which were not typically covered under prior CWA certifications. The State Agencies properly made a unique contribution instead of duplicating the efforts of other regulatory bodies as petitioners' request. *See Sierra Club*, 898 F.3d at 407.

13

Second, State Agencies have broad discretion when developing the criteria for their Section 401 Certification. The only requirement imposed by the regulations is that States must establish procedures for public notice when there are applications for certification, and to the extent deemed appropriate, procedures for public hearings in connection with specific applications. 33 U.S.C. § 1341(a)(1). Nonetheless, nothing in Section 401 restricts states to a single certificate proceeding, and Section 401 does not require states to undertake a single cumulative review of all possible impacts in a single certification.

Petitioners' rely on two federal regulations in arguing that a cumulative review is required, 40 C.F.R. § 230.7(a) and 40 C.F.R. § 230.11(g)(1), but those regulations impose duties—including a duty to make factual determinations and consider cumulative effects—on the Army Corps under Section 404, not on states under Section 401. Moreover, petitioners contend that two cases require State Agencies to take into account combined effects lest their decisions be rendered arbitrary and capricious. *See Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993 (9th Cir. 2004); *Idaho Rivers United v. Probert*, Case No.: 3:16-102, 2016 U.S. Dist. LEXIS 63767, at *32-34. Furthermore, petitioners invoke the Supreme Court's decision in *Motor Vehicles Manufacturers Association v. State Farm Mutual Automobile Ins. Co*., to argue that all "relevant data" must be considered. 463 U.S. 29, 43 (1983). We conclude, however, that both the *Klamath-Siskiyou Wildlands* and *Idaho Rivers United* cases are distinguishable and unpersuasive because in those cases the Bureau of Land Management and the Forest Service, respectively, faced violations under NEPA, not the CWA. *Klamath-Siskiyou*

14

*Wildlands Ctr.*, 387 F.3d at 993–94; *Idaho Rivers United*, 2016 U.S. Dist. LEXIS 63767, at \*33.  Unlike the CWA, NEPA requires a cumulative effects analysis, and thus cases decided under NEPA are not dispositive authority here.  Furthermore, *Motor Vehicle Manufacturers Association*, which deals with the National Highway Traffic Safety Administration, does not mention cumulative effects or the CWA, and thus the case does not stand for the proposition that the CWA should be broadened to encompass a combined impact analysis.

Finally, the State Agencies' failure to explicitly consider the combined effects of multiple areas of construction within individual watersheds such as the Chesapeake Bay watershed and the Chesapeake Bay Total Maximum Daily Load ("Bay TMDL") did not render their decision arbitrary and capricious.[2]  As an initial matter, despite petitioners' preferences, there are no express regulations that require the State Agencies to consider the combined effects of individual watersheds.  In addition, the Ninth Circuit has explained that TMDLs like the Chesapeake Bay TMDL are "primarily informational tools that allow states to proceed from the identification of water requiring additional planning to the required plans."  *Pronsolino v. Nastri*, 291 F. 3d 1123, 1129 (9th Cir. 2002).  Moreover, TMDLs do not give rise to an independent legal obligation. *Pronsolino,* 291 F.3d 1123, 1140. Consequently, the Chesapeake TMDL does not constitute a regulatory mandate that the State Agencies were required to address before issuing the Section 401 Upland Certification.  Furthermore, protection measures for the

---

[2] The Bay TMDL is a federal-state partnership that monitors the water quality standards in the Chesapeake Bay and its related tributaries. J.A. 888.

15

Chesapeake Bay TMDL are offered through other tools such as the FERC EIS and the Storm Water Prevention Plan. J.A. 664-665; 1138-1140.

The State Agencies more than satisfied their obligations by reviewing upland activities as well as stream and wetland crossings. The Board's decisions are not rendered arbitrary and capricious because it did not conduct an independent review of the cumulative effects on water quality within individual watersheds, even if this was petitioners' preference. To deem an agency action arbitrary and capricious their decision must be "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43. The lack of an explicit combined effect analysis in the Section 401 Upland Certification does not rise to this level, especially given that there are other regulatory tools that were utilized to consider those impacts.

## C.

### 1.

Turning to petitioners' third argument, we do not find that the State Agencies' reasonable assurance determination to be arbitrary and capricious simply because they relied on existing Virginia water quality standards and regulations to effectively address concerns regarding water quality deterioration.

Under the CWA, "states have the primary role in promulgating water quality standards." *Piney Run Preservation Ass'n v. County Comm'rs of Carroll Cty.*, 268 F.3d 255, 265 n.9 (4th Cir. 2001). States must initially classify the uses for which their water is to be protected and then determine the necessary level of water quality for their

16

preferred uses. *See NRDC v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993). Virginia's water-quality policy is relevant in two respects: its narrative water-quality criterion and its anti-degradation policy.

Virginia's water-quality criterion mandates that "State waters . . . shall be free from substances attributable to . . . waste in concentrations, amounts, or combinations which contravene established standards or interfere directly or indirectly with designated uses of such water or which are inimical or harmful to human, animal, plant, or aquatic life." 9 Va. Admin. Code § 25-260-20(A). The regulation explains that any substance "that produce[s] . . . turbidity" is a substance to be controlled. *Id.* The regulation provides examples of "turbidity" such as floating debris, oil, and other materials that are suspended solids in a body of water.

In addition, Virginia's antidegradation policy shall be applied whenever any activity is proposed that has the potential to affect existing surface water quality. 9 Va. Admin. Code § 25-260-30(A). The antidegradation policy classifies Virginia's water into three tiers and provides differing levels of protection based on the water's tier. *See* 9 Va. Admin. Code § 25-260-30(A).

The Policy defines Tier 3 waters as "exceptional"; these waters "shall be maintained and protected to prevent permanent or long-term degradation or impairment." 9 Va. Admin. Code § 25-260-30(A)(3)(b)(1). The policy specifically provides that "[n]o new, additional, or increased discharge of sewage, industrial wastes or other pollution into [Tier 3 waters] shall be allowed." 9 Va. Admin. Code § 25-260-30(A)(3)(b)(2). Nonetheless, "[a]ctivities causing temporary sources of pollution may be allowed in [Tier

17

3 waters] even if degradation may be expected to temporarily occur provided that after a minimal period of time the waters are returned or restored to conditions equal to or better than those existing just prior to the temporary source of pollution." 9 Va. Admin. Code § 25-260-30(A)(3)(b)(3).

The Policy defines Tier 2 waters as those that "exceed water quality standards." 9 Va. Admin. Code § 25-260-30(A)(2). The protection for these waters and their quality are lower and the regulation states that the quality of Tier 2 waters "shall be maintained and protected unless the board finds . . . that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located." 9 Va. Admin. Code § 25-260-30(A)(2).

Last, Tier 1 waters constitute all Virginia waters that are not designated Tier 2 or Tier 3. The regulation classifying the level of protection for these waters' states, "existing in-stream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." 9 Va. Admin. Code § 25-260-30(A)(1).

In Virginia a project may be permitted under a Construction General Permit. 9 Va. Admin. Code § 25-880-70 Part II. The Construction General Permit incorporates the requirements of two other state laws, the Virginia Storm Water Management ("VSM") Law, Va. Code § 62.1-44.15:24 *et seq*., and the Virginia Erosion and Sediment Control ("VESC") Law, Va. Code § 62.1-44.15:51, *et seq*.

The CWA has an exemption for natural gas pipeline construction projects and therefore Virginia's regulatory scheme diverges from the federal environmental protections. *See* 33 U.S.C. § 1342(I)(2). Consequently, Virginia still regulates natural

18

gas pipeline projects through its Annual Standards and Specifications ("AS&S") Program. *See* Va. Code § 62.1-44.15:55(D). The AS&S program requires a project developer to submit annual standards and specifications for DEQ's review and approval. *See* 9 Va. Admin. Code § 25-870-170(A). Through this program Virginia ensures that projects will meet the same requirements imposed on other projects subject to the Virginia Construction General Permit. *See* 9 Va. Admin. Code § 25-870-170(A). Nonetheless, once DEQ approves a developer's annual standards and specifications as satisfying the requirements of the VSM and VESC, the entity generally need not submit site-specific VSM and VESC plans to DEQ for approval. *See* Va. Code § 62.1-44.15:55(D). This allows the projects to become more self-regulating.

Typically, ensuring an activity's compliance with water quality standards requires an antidegradation review. *See Nat. Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993); *see also* 40 C.F.R. § 131.12 (requiring states to develop and adopt a statewide antidegradation policy). The CWA's antidegradation policy requires that state standards be "sufficient to maintain existing beneficial uses of navigable waters, preventing further degradation." 33 U.S.C. § 1313(d). State antidegradation policies must be consistent with 40 C.F.R. § 131.12(a), and must protect existing uses, maintain the existing quality of high-quality waters unless degradation is justified by important socioeconomic development, and prohibit degradation of national resource waters. *Id.* § 131.12(a).

19

**2.**

We do not find that the State Agencies' failure to conduct a separate antidegradation review before issuing its Upland Certification renders their decision arbitrary and capricious for two reasons.

First, in Virginia, the AS&S program requires a project developer to submit annual standards and specifications for DEQ's review and approval, thereby ensuring that projects will meet the same requirements that would apply were they covered by the Virginia Construction General Permit. *See* 9 Va. Admin. Code § 25-870-170(A). The AS&S also incorporate all the requirements of EPA's Construction General Permit. J.A. 1124-1125. The AS&S in this case were developed over eighteen months and represent a thorough process of development, revision and refinement to ensure that the ACP meet the technical and legal requirements for Virginia. J.A. 1087. Both federal and state regulators have concluded that application of technical requirements like those in the AS&S "will not result in a lowering of water quality," which renders the individualized review the petitioners suggest "unnecessary." J.A. 11. There is no indication that these AS&S fail to protect water quality in Virginia. To the contrary, these regulations have been found as a matter of law to protect water quality in Virginia. *See Kelble v. Commonwealth*, Case No. CL 14-762, at 4-5 (Richmond Cir. Ct. Apr. 10, 2017).

Second, State Agencies did not have to conduct a separate antidegradation review because the impact on sediment on the water would only be temporary. Under FERC's final EIS, it was determined that any water quality impacts stemming from construction would be temporary. J.A. 623. Even with respect to Tier 3 waters, the policy states that

20

"[a]ctivities causing temporary sources of pollution may be allowed in [Tier 3] waters . . . even if degradation may be expected to occur provided that after a minimal period of time the waters are returned or restored to conditions equal to or better that those existing just prior to the temporary source of pollution." 9 Va. Admin. Code 25-260-30A(3)(b)(3). Even in the most protected state waters, Virginia does not consider temporary sources of pollution, such as the construction of the ACP, to violate antidegradation policies.

Thus, nothing was arbitrary and capricious about the State Agencies' decision not to conduct a separate antidegradation review.

**D.**

Turning to the final challenge raised by petitioners, we find that the State Agencies' treatment of karst terrain was not arbitrary or capricious because of the conditions imposed on the Section 401 Upland Certification.

Karst geology refers to geological formations of soluble limestone bedrock that creates underground water flow systems where the rocks have dissolved and created sinkholes, caves and underground springs and rivers. J.A. 669. The constitution of these areas presents additional environmental considerations for pipeline construction including, sinkhole collapse, sinkhole flooding and associated groundwater contamination. J.A. 904-905.

The record demonstrates that the State Agencies took petitioners' concerns regarding karst geology into consideration. J.A. 31. Virginia's Section 401 Upland Certification contains five specific requirements concerning the protection of karst

21

terrain. J.A. 31-32. First, Atlantic must provide the State an addendum to a 51-page Karst Survey Report prior to any land disturbing activities. J.A. 212-237; J.A. 31. Second, Atlantic must follow the Karst Terrain Assessment, Construction, Monitoring, and Mitigation Plan. J.A. 31. This plan allows for route adjustments to avoid karst terrain. J.A. 1001. Third, based on the conditions in the Section 401 Upland Certification, Atlantic must conduct contingency planning in order to address any accidental spills or releases during construction on karst terrain. Fourth, water surveys regarding drinkable water in karst regions are required under the Section 401 Upland Certification. J.A. 31. Finally, Atlantic has a liability of five million dollars to cover the cost of any impacts to private water supplies, which encompasses karst regions. J.A. 32.

Reliance on these conditions, even the prospective ones, does not render the State Agencies' issuance of the Section 401 Upland Certification arbitrary and capricious. *See Port of Seattle v. Pollution Control Hearings Bd.*, 90 P.3d 659, 677 (Wash. 2004) (holding regulators did not act arbitrarily or capriciously by basing reasonable assurance "on future submissions of revised plans, reports, and studies, so long as their implementation and anticipated outcome meet the reasonable assurance test").

Moreover, the mere existence of risk to karst geology does not render the State Agencies' decision to issue the Section 401 Upland Certification arbitrary and capricious. Based on the information in the record, this Court finds that the State Agencies had reasonable assurance that karst regions would be protected given the conditions imposed on the Section 401 Upland Certification. We "see no purpose we would serve by stepping in and second-guessing the analytical methods Virginia deemed appropriate to

22

provide it with reasonable assurance that its water quality would be protected." *Sierra Club.*, 898 F.3d at 407.

## VIII.

Governmental agencies can always take additional steps to increase the protection of the environment. But that is not the applicable legal standard this Court utilizes when reviewing a state agency's issuance of a Section 401 Certification. We must determine "whether the agency considered the relevant factors and whether a clear error of judgment was made." *Ohio Valley Envtl. Coal.,* 556 F.3d 177, 192. There is no indication that the State Agencies did not consider relevant factors or that they clearly made an error of judgment. In conclusion, because we find that the State Agencies did not act arbitrarily and capriciously in issuing the Section 401 Upland Certification, we deny the petition for review.

*PETITION FOR REVIEW DENIED*