**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 21-2425**

_____

SIERRA CLUB; APPALACHIAN VOICES; CHESAPEAKE CLIMATE ACTION NETWORK; WILD VIRGINIA; PRESERVE CRAIG, INC.; BLUE RIDGE ENVIRONMENTAL DEFENSE LEAGUE; PRESERVE FRANKLIN; PRESERVE BENT MOUNTAIN; PRESERVE GILES COUNTY; NATURAL RESOURCES DEFENSE COUNCIL, INC.,

      Petitioners,

   v.

STATE WATER CONTROL BOARD; HEATHER WOOD, in her official capacity as Chair of the State Water Control Board; LOU ANN JESSEE-WALLACE, in her official capacity as Vice-Chair of the State Water Control Board; JILLIAN COHEN, in her official capacity as a Member of the State Water Control Board; TIMOTHY G. HAYES, in his official capacity as a Member of the State Water Control Board; PAULA HILL JASINSKI, in her official capacity as a Member of the State Water Control Board; RYAN C. SEIGER, in his official capacity as a Member of the State Water Control Board; DR. JACK O. LANIER, in his official capacity as a Member of the State Water Control Board; VIRGINIA DEPARTMENT OF ENVIRONMENTAL QUALITY; DAVID K. PAYLOR, in his official capacity as Director of the Virginia Department of Environmental Protection; DAVID L. DAVIS, in his official capacity as Director of the Office of Wetlands and Stream Protection, Virginia Department of Environmental Quality,

      Respondents,

MOUNTAIN VALLEY PIPELINE, LLC,

      Intervenor.

_____

On Petition for Review from the Virginia Department of Environmental Quality's VWP Individual Permit Number 21-0416

_____

Argued: January 24, 2023                             Decided: March 29, 2023

---

Before GREGORY, Chief Judge, and WYNN and THACKER, Circuit Judges.

---

Petition for review denied by published opinion. Judge Thacker wrote the opinion, in which Chief Judge Gregory and Judge Wynn joined.

---

**ARGUED:** Derek Owen Teaney, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, for Petitioners. Erika L. Maley, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Respondents. George Peter Sibley, III, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Intervenor. **ON BRIEF:** Benjamin A. Luckett, Elizabeth A. Bower, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, for Petitioners Sierra Club; Appalachian Voices; Chesapeake Climate Action Network; Wild Virginia; Preserve Craig, Inc.; Blue Ridge Environmental Defense League; Preserve Franklin; and Natural Resources Defense Council, Inc. Gregory Buppert, Spencer Gall, Claire Horan, SOUTHERN ENVIRONMENTAL LAW CENTER, Charlottesville, Virginia, for Petitioners Preserve Bent Mountain and Preserve Giles County. Jason S. Miyares, Attorney General, Charles H. Slemp, III, Chief Deputy Attorney General, Michael A. Jagels, Senior Assistant Attorney General, Andrew N. Ferguson, Solicitor General, Kevin M. Gallagher, Deputy Solicitor General, Annie Chiang, Assistant Attorney General, Rohiniyurie Tashima, John Marshall Fellow, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Respondents. J. Pierce Lamberson, Richmond, Virginia, Deirdre G. Duncan, HUNTON ANDREWS KURTH LLP, Washington, D.C.; Justin W. Curtis, AQUALAW PLC, Richmond, Virginia, for Intervenor.

---

THACKER, Circuit Judge:

In February 2021, Mountain Valley Pipeline, LLC (''MVP'') submitted an application requesting both a Virginia Water Protection individual permit ("VWP Permit") from Virginia's Department of Environmental Quality ("DEQ") and the State Water Control Board (the "Board") (collectively, "the Agencies") and a certification from the United States Army Corps of Engineers ("Army Corps") pursuant to Section 404 of the Clean Water Act ("CWA"). "The [Army Corps] issues authorizations pursuant to section 404 of the [CWA] . . . to conduct dredging in navigable waters of the United States and to discharge dredged[1] and fill[2] materials into jurisdictional wetlands and waters." *AES Sparrows Point LNG v. Wilson*, 589 F.3d 721, 725 (4th Cir. 2009) (internal citations omitted). However, pursuant to Section 401 of the CWA, "an entity seeking federal permits for activity that may pollute a State's waters must acquire State certification that the activity will comply with applicable water laws, including the State's water standards." *Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality*, 990 F.3d 818, 823 (4th Cir.

---

[1] "Dredged material is sediment excavated or otherwise removed from the bottoms of the navigable waters of the United States to maintain navigation channels and docks." United States Environmental Protection Agency, *Ocean Disposal of Dredged Material*, https://www.epa.gov/ocean-dumping/ocean-disposal-dredged-material (saved as ECF opinion attachment) (last visited Feb. 27, 2023).

[2] Fill material is "material placed in waters of the [United States] where the material has the effect of . . . [r]eplacing any portion of a water of the United States with dry land; or . . . [c]hanging the bottom elevation of any portion of a water of the United States." 40 C.F.R. § 232.2. Examples of such material include "rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in waters of the United States." *Id.*

2021). "Without a 401 certification, no other Federal license or permit to conduct any activity which may result in any discharge into waters of the United States is valid." *Ohio Valley Env't Coal., Inc. v. U.S. Army Corps of Eng'rs*, 828 F.3d 316, 319 (4th Cir. 2016) (alteration adopted and internal quotation marks omitted).

After an extensive review of MVP's application, the Board adopted DEQ's recommendation to approve MVP's application on December 14, 2021. Petitioners[3] filed this action against the Agencies and several individuals associated with the Agencies (collectively, "Respondents[4]"), asking the court to review the Agencies' decision. Because we conclude that the Agencies' decision to grant MVP's application was neither arbitrary nor capricious, we deny the petition for review.

I.

MVP seeks to build a 42-inch-diameter natural gas pipeline (the "Pipeline") that will span approximately 304 miles from Wetzel County, West Virginia to Pittsylvania County, Virginia. The portion of the project located within Virginia consists of

---

[3] Petitioners are the Sierra Club; Appalachian Voices; Chesapeake Climate Action Network; Wild Virginia; Preserve Craig, Inc.; Blue Ridge Environmental Defense League; Preserve Franklin; Preserve Bent Mountain; Preserve Giles Count; and National Resources Defense Council, Inc.

[4] Respondents are the Board, Heather Wood, in her official capacity as Chair of the Board; Lou Ann Jessee-Wallace, in her official capacity as Vice-Chair of the Board; Jillian Cohen, in her official capacity as a Member of the Board; Timothy G. Hayes, in his official capacity as a Member of the Board; Paula Hill Jasinski, in her official capacity as a Member of the Board; Ryan C. Seiger, in his official capacity as a Member of the Board; Dr. Jack O. Lanier, in his official capacity as a Member of the Board; DEQ; Michael Rolband, in his official capacity as Director of DEQ; and David L. Davis, in his official capacity as Director of the Office of Wetlands and Stream Protection.

approximately 107 miles of pipeline and 51 miles of access roads in Giles, Craig, Montgomery, Roanoke, Franklin, and Pittsylvania Counties.

As part of the Pipeline construction process, MVP must comply with federal and state laws designed to minimize the environmental impact associated with constructing and operating natural gas pipelines. Pursuant to the Natural Gas Act ("NGA"), interstate natural gas companies cannot construct or operate pipelines without Federal Energy Regulatory Commission ("FERC") issued certificates of public convenience and necessity. *See Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 750 (4th Cir. 2019). FERC functions as the lead agency in coordinating the required authorizations and will only issue a certificate if the public benefits from the project outweigh any adverse effects.

In October 2017, FERC issued its certificate authorizing the Pipeline's construction. Because this project will result in the discharge of dredged and fill materials into wetlands and waterways, MVP was required to obtain "not only a certificate of public convenience and necessity from FERC, but also a Section 404 CWA authorization from the [Army Corps]." *Appalachian Voices*, 912 F.3d at 750. We have previously explained that the Army Corps has established two methods to obtain a permit to discharge fill material into federal waters. *See Sierra Club v. U.S. Army Corps of Eng'rs* (*Sierra Club II*), 909 F.3d 635, 640 (4th Cir. 2018). First, the Army Corps "can issue *individual* permits on a case-by-case basis, through a resource-intensive review requiring extensive site-specific research and documentation, promulgation of public notice, opportunity for public comment, consultation with other federal agencies, and a formal analysis justifying the ultimate decision to issue or refuse the permit." *Id.* (emphasis supplied). Second,

5

"interested parties can try to fit their proposed activity within the scope of an existing *general* permit, in this case [Nationwide Permit 12], which acts as a standing authorization for developers to undertake an entire category of activities deemed to create only minimal environmental impact." *Id.* (emphasis supplied).

MVP initially opted to pursue Section 404 approval from the Army Corps by obtaining authorization under the existing general permit, Nationwide Permit 12 ("NWP 12"). However, in 2018, we vacated the Army Corps' verification for the construction of the Pipeline to proceed pursuant to NWP 12 and indicated that "an individual permit will likely be necessary." *Sierra Club II*, 909 F.3d at 655. Because the project was no longer authorized to proceed under the general permit, MVP elected to seek an individual permit from the State of Virginia.

Upon receipt of MVP's application, DEQ published a public notice in regard to a draft VWP Permit "for surface water impacts at the remaining water body crossings being proposed for [the Pipeline]." J.A. 506.[5] The notice was published "in fourteen newspapers with circulation areas that covered the counties and localities affected by these project crossings." *Id.* DEQ received nearly 8,000 comments from the public and the Board subsequently held multiple hearings where it heard from the public directly. In addition to these public meetings, DEQ provided written responses to the public comments in which it addressed several "recurring issues and themes raised by the commenters." *Id.* at 507. Relevant here, when addressing concerns regarding the Pipeline's potential impact on

---

[5] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Virginia's water quality standards, DEQ stated, "there are many regulatory programs and permits that apply to the construction of the Mountain Valley Pipeline [and] [t]hese tools provide comprehensive oversight and technical evaluation to ensure that Virginia's water quality is protected both during and after construction." *Id*. Additionally, with respect to Virginia's narrative water quality standard,[6] DEQ explained that it "conducts regular water quality monitoring" and "utilizes a number of objective, data driven indicators to assess water quality." *Id*. at 514. The indicators that DEQ uses to measure water quality include: "dissolved oxygen, pH, temperature, water column and sediment toxics, toxicity tests, bottom-dwelling macroinvertebrates, submerged aquatic vegetation, notices published by the Virginia Department of Health, fish tissue toxics, and bacteria." *Id.*

Additionally, DEQ provided a Final Fact Sheet in which it explained that it reviewed each crossing in MVP's application and concluded that MVP met its burden to provide an alternatives analysis demonstrating that the proposed activity -- in terms of impacts to state waters and fish and wildlife resources -- is the least environmentally damaging practicable alternative (the "LEDPA"). In doing so, DEQ noted, "the alternatives evaluated are not practicable and/or do not meet the [Pipeline's] purpose and need." J.A. 91. As a result, DEQ concluded that the "proposed project is the LEDPA." *Id.*

---

[6] According to DEQ's website, "[w]ater quality criteria can include general narrative statements that describe good water quality and specific numerical concentrations that are known to protect aquatic life and human health." Va. Dep't of Env't Quality, *Criteria, Designated Uses, Antidegradation*¸ https://www.deq.virginia.gov/water/water-quality/water-quality-standards/criteria-designated-uses-antidegradation (saved as ECF opinion attachment) (last visited Feb. 27, 2023).

7

On December 14, 2021, the Board held a meeting in which DEQ made a presentation on the VWP Permit to the Board. At that meeting, DEQ recommended that the Board grant MVP's application for an individual VWP Permit based on, among other things, the Final Fact Sheet, the public comments and DEQ's responses to those comments, and DEQ's presentation. Further, DEQ concluded, "the proposed activity is consistent with the provisions of the [CWA] and State Water Control law and there is reasonable assurance that compliance with the permit will protect instream beneficial uses and will not violate applicable water quality standards." J.A. 796. The Board adopted DEQ's recommendation to approve MVP's application for an individual VWP Permit at the December 14, 2021 meeting. The VWP Permit was finalized and issued to MVP on December 20, 2021.

On December 22, 2021, Petitioners filed a petition in this court for a review of the Agencies' decision to issue the VWP Permit pursuant to 15 U.S.C. § 717r(d)(1). Petitioners assert that the VWP Permit should be vacated because the Agencies failed to: (1) evaluate whether alternative crossing locations would be environmentally preferable and practicable; (2) independently verify whether each of MVP's proposed water crossing methods was the LEDPA; and (3) determine whether the Pipeline will comply with Virginia's narrative water quality standards. In addition to disputing these arguments, Respondents contend that this court lacks jurisdiction to review the petition.

II.

In reviewing Virginia's Section 401 certification, "we may hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law."[7] *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 643 (4th Cir. 2018) (alteration adopted and internal quotation marks omitted). Although "[t]he arbitrary and capricious standard is not meant to reduce judicial review to a rubber-stamp of agency action," we have made clear that "[d]eference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (internal quotation marks omitted). Additionally, an agency action "may not stand if the agency has misconceived the law." *SEC v. Chenery Corp.*, 63 S. Ct. 454, 462 (1943).

III.

A.

Respondents argue that this court lacks jurisdiction to review the petition for two reasons. First, Respondents contend that we lack jurisdiction pursuant to the NGA because the NGA provides jurisdiction "over state agency action only to the extent that the Agency

---

[7] In *Sierra Club v. State Water Control Bd.* (*Sierra Club I*), we noted that the government questioned whether the arbitrary and capricious standard argued for by the petitioners was the correct approach "given that the [Administrative Procedures Act] does not cover state agencies." 898 F.3d 383, 403 n.13 (4th Cir. 2018) (internal quotation marks omitted). There, we declined to apply the government's proposed "substantial-evidence" standard of review based on Virginia law because the "[p]etitioners' claims fail[ed] even under their preferred standard." *Id.* We take the same approach here.

9

is acting pursuant to *Federal law*," and here, Petitioners' claims are rooted in state law. Resp'ts' Br. at 36 (emphasis in original). Second, Respondents assert that Virginia did not waive sovereign immunity by participating in the regulatory schemes of the NGA and CWA. Respondents are incorrect on both points.

1.

The NGA grants federal courts of appeal "original and exclusive jurisdiction over any civil action for the review of an order or action of a . . . State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval . . . required under Federal law." 15 U.S.C. § 717r(d)(1). The Third Circuit addressed the question of whether a state agency is acting pursuant to federal law when it issues a water quality certification in *Delaware Riverkeeper Network v. Secretary Pennsylvania Department of Environmental Protection* (*Delaware Riverkeeper I*), 833 F.3d 360, 371 (3rd Cir. 2016). In answering that question in the affirmative, the *Delaware Riverkeeper I* court emphasized, "a Water Quality Certification is not merely required by federal law: it cannot *exist* without federal law, and is an integral element in the regulatory scheme established by the Clean Water Act." *Id.* (emphasis in original). A state water quality certification cannot exist without federal law because "[w]hile the [NGA] largely preempts environmental regulation of interstate natural gas pipelines by states, the statute expressly preserves State authority to regulate pipelines under the [CWA]." *Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality*, 990 F.3d 818, 823 (4th Cir. 2021) (internal quotation marks omitted).

10

We agree with the Third Circuit that the NGA "empowers us to hear any civil action seeking review of federal permits required by interstate pipelines." *Del. Riverkeeper Network v. Sec'y Pa. Dep't of Env't Prot.* (*Delaware Riverkeeper III*), 903 F.3d 65, 78 (3d Cir. 2018) (internal quotation marks omitted). In cases such as this, where the project involves the possibility of discharge into navigable waters, a water quality certification is required by federal law. *See N.C. Dep't of Env't. Quality v. FERC*, 3 F.4th 655, 661 (4th Cir. 2021). Consequently, because "a state participates in [CWA] regulation of interstate natural gas facilities by congressional permission, rather than through inherent state authority[,]" *Delaware Riverkeeper I*, 833 F.3d at 376, we conclude that a state administrative agency necessarily acts pursuant to federal law when it uses the regulatory authority granted to it by the CWA to issue a water quality certification. DEQ was acting pursuant to the authority granted to it through the CWA when it issued the VWP Permit. Accordingly, we have jurisdiction to hear this case pursuant to 15 U.S.C. § 717r(d)(1).

2.

Respondents' sovereign immunity argument fares no better. The Second and Third Circuits have held that a state's voluntary participation in the NGA and CWA's regulatory schemes results in federal jurisdiction over the state's decisions made pursuant to that scheme. *See Del. Riverkeeper I*, 833 F.3d at 375 ("[V]oluntary participation in the regulatory schemes of the [NGA] and the [CWA] constitutes a waiver of sovereign immunity, given the clear language in those statutes subjecting their actions to federal review"); *Islander E. Pipeline Co., LLC v. Conn. Dep't of Env't Prot.*, 482 F.3d 79, 90–91 (2d Cir. 2006) (same). In reaching this conclusion, the Second and Third Circuits applied

11

the principle of "gratuity waiver" to the NGA. *Del. Riverkeeper I*, 833 F.3d at 377; *Islander*, 482 F.3d at 91. A "gratuity waiver" of sovereign immunity occurs when a state accepts a gift or gratuity from Congress and Congress "manifests a clear intent to condition the gift or gratuity on the State's waiver of its constitutional immunity." *Bell Atl. Md., Inc. v. MCI WorldCom, Inc.*, 240 F.3d 279, 290 (4th Cir. 2001) (alteration adopted and internal quotation marks omitted), *vacated on other grounds sub nom. Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 122 S. Ct. 1753 (2002). Central to the *Delaware Riverkeeper I* court's conclusion that Congress manifested a clear intent to condition a state's regulatory authority on the state's waiver of its constitutional immunity was the plain language in § 717r(d)(1), which "grants the Courts of Appeals jurisdiction to review state agency action." *Del. Riverkeeper I*, 833 F.3d at 377 (internal quotation marks omitted).

Applying the reasoning in *Delaware Riverkeeper I* and *Islander* here, we readily conclude that § 717r(d)(1) put the Agencies on notice that any action they took relative to the issuance, conditioning, or denial of a water quality certification would be subject to federal judicial review. Therefore, we conclude that Respondents waived the defense of sovereign immunity by issuing the VWP Permit.

B.

Turning to the merits of the petition, as noted above, Petitioners argue that the Agencies' issuance of the VWP Permit was not in accordance with the law because the Agencies failed to: (1) evaluate alternative crossing locations; (2) verify MVP's crossing methods were the LEDPA; and (3) evaluate whether the Pipeline will comply with Virginia's narrative water quality standards. We address each argument in turn.

12

1.

a.

Petitioners' first argument turns on whether the Agencies properly interpreted Sections 62.1-44.15:21(D)(2) ("Section 21(D)(2)") and 62.1-44.15:81(F) ("Section 81(F)") of the Virginia Code, both of which plainly prohibit the Agencies from altering FERC siting determinations. Specifically, Petitioners argue that these provisions are inapplicable to this case because Section 21(D)(2) does not apply to large diameter pipelines like MVP's and Section 81(F) concerns only "upland" certifications, which are not at issue here.

In relevant part, Section 21(D)(2) provides that the Board shall develop general permits for:

> Facilities and activities of utilities and public service companies regulated by [FERC] or State Corporation Commission, *except for construction of any natural gas transmission pipeline that is greater than 36 inches inside diameter* pursuant to a certificate of public convenience and necessity under § 7c of the federal [NGA] (15 U.S.C. § 717f(c)). *No Board action on an individual or general permit for such facilities shall alter the siting determination* made through [FERC] or State Corporation Commission approval.

Va. Code Ann. § 62.1-44.15:21(D)(2) (emphasis supplied). Similarly, Section 81(F) states, "[n]o action by either [DEQ] or the Board on a certification pursuant to this article *shall alter the siting determination* made through [FERC] or State Corporation Commission approval." *Id.* § 62.1-44.15:81(F) (emphasis supplied).

13

The crux of Petitioners' argument with respect to Section 21(D)(2) is that this provision is limited to pipelines with a diameter of 36 inches or less. Petitioners' argument lacks merit. It is clear from the plain language of this provision that its purpose is to describe the types of activities or projects that can be completed pursuant to a general permit. In describing the types of activities that the Board shall develop general permits for, Section 21(D)(2) lists "Facilities and activities of utilities and public service companies regulated by the [FERC] . . . except[8] for construction of any natural gas transmission pipeline that is greater than 36 inches in diameter." Va. Code. Ann. § 62.1-44.15:21(D)(2). The sentence following the except clause prohibits the Board from taking any "action on an individual or general permit for *such facilities* [which would] alter the siting determination made through [FERC]." *Id.* (emphasis supplied).

Petitioners contend that Section 21(D)(2)'s use of the phrase "such facilities" suggests that the prohibition against altering FERC siting determinations only applies to pipelines greater than 36 inches in diameter. We disagree. Reading Section 21(D)(2) as a whole, it is clear that it operates in two ways. First, it prohibits the Board from developing general permits for pipelines greater than 36 inches in diameter. Second, it provides that regardless of the *type* of permit at issue -- namely, individual, or general -- the Board is prohibited from taking any action that would alter the FERC's siting determinations. Because there is nothing in Section 21(D)(2) which suggests that the Board's ability to

---

[8] For clarity, we refer to the language precluding general permits for pipelines greater than 36 inches in diameter as the "except clause."

develop individual or general permits is related to its *inability* to alter siting determinations, we conclude that Petitioners' argument lacks merit.

Moreover, even if the statutory language is unclear, we nevertheless would reach the same conclusion because the legislative history supports our construction of Section 21(D)(2). In 2018, the Virginia General Assembly amended this statute through Senate Bill 950, which among other things, added the "except clause" described above to Section 21(D)(2). *See* 2018 Va. Laws Ch. 636 (S.B. 950). The previous version of Section 21(D)(2) included the same prohibition against altering FERC siting determinations. *See* Va. Code Ann. § 62.1-44.15:21(D)(2) (effective Jan. 12, 2016 to June 30, 2018), amended by 2018 Va. Laws Ch. 636  (S.B. 950). Petitioners have not identified anything in the legislative history which suggests that the General Assembly intended to change the meaning of the prohibition against altering FERC siting determinations when it added the "except clause" to the statute. Accordingly, we conclude that the Agencies correctly interpreted Virginia law as prohibiting them from altering FERC siting determinations. And because we conclude that Section 21(D)(2) is applicable here, we need not address the parties' arguments relative to Section 81(F).

b.

We turn now to the merits of Petitioners' argument that the Agencies were required to ask, "on a crossing-by-crossing basis, whether alternative sites for MVP's proposed crossings would avoid or result in less adverse impact to state waters." Pet'rs' Opening Br. at 29 (citing 9 Va. Admin. Code § 25-210-80(B)(1)(g)) (internal quotation marks omitted). On this point, Respondents emphasize that the Pipeline is a large, contiguous

15

project, and, as such, changing one stream crossing would alter the Pipeline's siting in other places. Petitioners have failed to present any evidence indicating that any crossing could be moved without altering the Pipeline's siting elsewhere. Because there is nothing before the court from which we can conclude that the Agencies could have changed one crossing without altering FERC's siting determination, we conclude that the Agencies correctly applied Virginia law by approving MVP's proposed crossing locations.

2.

Petitioners next argue that the Agencies acted arbitrarily and capriciously by failing to independently verify whether each of MVP's proposed water crossing methods was the LEDPA. Pursuant to Virginia law, it is the VWP Permit applicant's burden to provide an alternatives analysis which demonstrates to the satisfaction of DEQ that "the proposed activity in terms of impacts to state waters and fish and wildlife resources is the [LEDPA]." 9 Va. Admin. Code § 25-210-80(B)(1)(g). And, as Respondents point out, Virginia law only requires that DEQ individually review "each proposed water body crossing with an upstream drainage area of five square miles or greater." Va. Code Ann. § 62.1-44.15:21(J)(1). Out of the Pipeline's 236 surface water crossings in Virginia, only 13 met the threshold necessary to require agency review. Nevertheless, DEQ reviewed *all* of the crossings in MVP's application prior to issuing the VWP Permit.

Petitioners contend that the Agencies' decision to issue the VWP Permit was arbitrary and capricious because the Agencies failed to address Petitioners' expert report. Petitioners' expert report criticized MVP's proposed crossing methods and asserted that MVP's application was so deficient that it is "impossible to fairly assess whether [MVP's]

16

proposal is in fact the [LEDPA]." J.A. 1840. Even if the Agencies did not address Petitioners' expert report by name, it is clear from the record that the Agencies considered feedback relative to MVP's proposed crossing methods and ultimately concluded that MVP's proposal was the LEDPA. For instance, in response to a comment from the Environmental Protection Agency ("EPA") relative to MVP's proposed crossing methods, DEQ stated, "[it] reviewed [MVP's] crossing method analysis, including the new information, and determined that the crossing methodology analysis as proposed in the Application is consistent with DEQ's requirements for avoidance and minimization." *Id.* at 543–44.

Further, as noted above, DEQ did not simply grant MVP's application without considering its merits. Rather, the agency held multiple public meetings where it heard directly from the public, considered nearly 8,000 public comments, addressed several recurring issues raised by the commenters, and provided a Final Fact Sheet detailing its reasons for recommending that the Board grant MVP's application for a VWP Permit. In the Final Fact Sheet, DEQ explained that MVP satisfied its burden to demonstrate that the "proposed project is the LEDPA." J.A. 91. In doing so, DEQ emphasized, "the alternatives evaluated are not practicable and/or do not meet the [Pipeline's] purpose and need." *Id.*

Indeed, despite Petitioners' assertion to the contrary, there is evidence in the record which indicates that the Agencies did not simply "rubber stamp" MVP's proposed crossing methods. Rather, the Agencies asked a number of clarifying questions to ensure they were satisfied that the project minimizes the impact on the environment. For example, DEQ highlighted an apparent conflict between MVP's proposed crossing methods at a specific

17

crossing location and asked MVP to clarify whether they would use a "dry ditch, open cut" or "conventional bore" crossing method.  J.A. 374.  In reviewing another crossing, DEQ noted that the crossing "is located at the terminus of a temporary access road that ends in an apparent residential/farmyard" and asked, "[c]an the road end just prior to the wetland and associated stream to avoid this impact?"  *Id.* at 376.  All told, we are satisfied that the Agencies considered the relevant data and provided a satisfactory explanation for their conclusion.  *See Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 753 (4th Cir. 2019) ("To survive review under the arbitrary and capricious standard, an agency decision must show that the agency examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made."(alteration adopted and internal quotation marks omitted)).

At the time the VWP Permit was issued, Virginia law required that the Board provide a "clear and concise statement of the legal basis and the justification for [its] decision."  Va. Code Ann. § 62.1-44.15:02(P) (repealed 2022).  The Agencies have clearly done that in this instance.  Because it is clear from the record that the Agencies considered MVP's proposal, asked clarifying questions, and satisfied itself that the proposed crossing methods were the LEDPA, we conclude that the Agencies' review of MVP's proposed crossing methods was neither arbitrary nor capricious.

3.

Lastly, Petitioners argue that the Agencies acted arbitrarily and capriciously by failing to address whether the Pipeline would comply with Virginia's narrative water

18

quality standard.  The provision of the Virginia Administrative Code governing Virginia's narrative water quality standard provides:

> State waters, including wetlands, shall be free from substances attributable to sewage, industrial waste, or other waste in concentrations, amounts, or combinations which contravene established standards or interfere directly or indirectly with designated uses of such water or which are inimical or harmful to human, animal, plant, or aquatic life.

9 Va. Admin. Code § 25-260-20(A).  Petitioners' argument that the Agencies failed to consider whether the Pipeline will comply with Virginia's narrative water quality standard is belied by the record.  DEQ addressed this issue in its responses to the public comments, in which it listed a host of conditions that it placed on the VWP Permit to "ensure that Virginia's water quality is protected both during and after construction."  J.A. 507.  In addition, DEQ described the indicators it uses to measure water quality, which Petitioners have not challenged.  Because it is clear from the record that DEQ considered a variety of factors in determining that the construction and operation of the Pipeline would comply with Virginia's narrative water quality standard, we conclude that the Agencies did not act arbitrarily and capriciously by determining that the Pipeline will comply with Virginia's narrative water quality standard.

IV.

For the reasons set forth herein, we deny the petition for review.

*PETITION FOR REVIEW DENIED*

19